**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 10 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

---

WOODWORKER'S SUPPLY, INC.,

      Plaintiff-Appellee/
      Cross-Appellant,

v.

PRINCIPAL MUTUAL LIFE
INSURANCE COMPANY,

      Defendant-Appellant/
      Cross-Appellee,

Nos. 97-2226
97-2232

---

Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CIV 95-1583 BB/DJS)

---

Doug K. Butler (Bill E. Davidoff with him on the briefs) of Figari & Davenport,
L.L.P., Dallas, Texas, for Defendant-Appellant/Cross-Appellee.

William C. Madison and Gregory D. Steinman of Madison, Harbour, Mroz &
Brennan, P.A., Albuquerque, New Mexico, for Plaintiff-Appellee/Cross-
Appellant.

---

Before **SEYMOUR**, Chief Judge, **BALDOCK** and **BRORBY**, Circuit Judges.

---

**SEYMOUR**, Chief Judge.

In this diversity action, Woodworker's Supply, Inc. (Woodworker) sued its former insurer, Principal Mutual Life Insurance Company, for unfair trade practices and fraud. The district court held that the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et. seq.*, bars claims arising after March 1, 1994, the effective date of the parties' agreement, but sent to the jury the claims arising prior to that date. The jury awarded Woodworker $221,000 based on Principal Mutual's violations of the New Mexico Unfair Insurance Practices Act, N.M. STAT. ANN. §§ 59A-16-1 *et. seq.*, the New Mexico Unfair Practices Act, N.M. STAT. ANN. §§57-12-1 *et. seq.*, and fraud in the inducement. Principal Mutual appeals, arguing that 1) ERISA preempts all of Woodworker's claims; 2) Woodworker improperly failed to disclose its damage theory prior to trial; 3) the evidence was insufficient to support the jury's findings of fraud, violations of the New Mexico statutes, and damages; and 4) Principal Mutual is entitled to contract damages resulting from Woodworker's failure to pay certain premiums. Woodworker cross-appeals, claiming that 1) the district court erred by not sending the issue of punitive damages to the jury; and 2) in refusing to award treble damages under the state statutes; 3) we should award Woodworker attorney's fees and costs on appeal; 4) and if we order a new trial, the jury should be permitted to consider conduct occurring after March 1, 1994. We affirm in part and reverse in part.

## I.

We review the evidence in the light most favorable to Woodworker because the jury found in its favor. *See Webb v. ABF Freight Sys. Inc.*, 155 F.3d 1230, 1234 n.1 (10th Cir. 1998). "[W]e accept the jury's factual determinations as long as they are reasonably based on some evidence or the inferences that may reasonably be drawn from such evidence." *Id.* Under this standard of review, the record establishes the following facts.

At the end of 1993, Woodworker, a manufacturer and supplier of woodworking tools and equipment, was shopping for insurance coverage for its employees. It was dissatisfied with its previous insurer, Washington National, for processing claims inefficiently and inaccurately. Woodworker received bids from several insurance companies, including Principal Mutual, through its insurance broker, Nadyne Shimada.

Woodworker had previous experience with different types of insurance contracts. Washington National had provided Woodworker with a contingent premium contract, also known as a retrospective premium agreement. Under such an agreement, the insurer sets two rates, the preliminary premium and the contract premium. During the course of the year, the insured pays the preliminary premium which is the lower of the two rates. At the end of the year, the insurer

calculates the claims paid as well as certain other charges. If this calculation is lower than the preliminary premium, the insured pays nothing further. If it is higher, the insured pays the difference but never more than the contract rate. In exchange for this flexibility, the maximum liability is somewhat higher than it would be were only one rate set. Woodworker's experience with this arrangement had been positive. Its claims had been 60-70% of the preliminary premium, and it never had to make an additional payment at the end of the year.

When Ms. Shimada solicited bids for a new insurer on behalf of Woodworker, she looked for a plan structured similarly to Washington National's. Principal Mutual submitted a low bid, so low in fact that Ms. Shimada sent it back for the company to revise its rates upwards. Rates that are too low may harm the insured in several ways. They may indicate insufficient coverage. Or, in a contingent funding agreement, inadequate preliminary premiums may subject the insured to unexpected collections at the end of the year or significant rate increases for the next year.

Principal Mutual resubmitted an increased bid and set the preliminary rates 25% below the contract rate. According to Ms. Shimada's analysis, the rates seemed reasonable and she recommended Principal Mutual's plan to Woodworker. Principal Mutual began insuring Woodworker on March 1, 1994, although the parties did not sign the retrospective premium agreement until late July 1994.

-4-

Unbeknownst to Woodworker, the underwriter of the plan, Melissa Lorek, had serious doubts about the adequacy of the rates. On February 28, 1994, she e-mailed Laura Bullock, the Principal Mutual sales representative on the Woodworker contract:

> We don't feel comfortable with increasing the retro differential past the 20%. We did, originally, look at this as an option. We decided against this because, upon closer examination, the contract rates are already inadequate. . . . We feel we have already been very aggressive with this case and I don't feel comfortable with getting any more aggressive.

Supp. App. at 64. Ms. Bullock responded the following day, "This is completely unacceptable. . . . This is a done deal." *Id.* at 66. Principal Mutual made no further changes to the rates. In a letter discussing contract renewal and rate increases for the following year, Ms. Lorek told Ms. Shimada, "When [Principal Mutual] sold this case last March, [it] knew the rates were inadequate." *Id.* at 68; *see also* Aplt. App. at 766. Prior to that, no one from Principal Mutual had told Ms. Shimada that the rates charged to Woodworker were inadequate.

Principal Mutual also failed to fully disclose certain aspects of the method it used to calculate rates, increasing the likelihood that Woodworker would experience large rate increases and charges in excess of the preliminary premiums. For example, Principal Mutual's method for determining reserves to cover "incurred but not reported" expenses deviated from the industry norm and significantly impacted Woodworker's renewal program. Principal Mutual did not

disclose this to Woodworker until February 1995. In addition, while the contract mentioned pooling charges, it did not indicate that such charges could equal up to 15% of the contract premium. Even though Woodworker paid $178,000 in premiums in 1994, its claims would have to have been less than $50,000 to avoid an end of the year surcharge. Had Woodworker known this prior to March 1, 1994, it would not have contracted with Principal Mutual.

As would be expected, Principal Mutual's omissions resulted in a significant charge at the end of 1994 as well as a large rate increase for the following year. Severe disagreements ensued between Principal Mutual and Woodworker. Woodworker refused to pay the increase in the rates, as well as the 1994 surcharge. Principal Mutual demanded payments and unilaterally increased the 1995 rates. Finally, Principal Mutual terminated Woodworker's coverage effective midnight, August 31, 1995.

## II.

### A.     ERISA Preemption

The primary legal question in this case is whether, and to what extent, ERISA preempts Woodworker's claims against Principal Mutual.[1] The trial court

_____

[1] Woodworker does not contend that Principal Mutual's counter-claim

(continued...)

originally dismissed as preempted only those claims arising "out of Principal's alleged failure to provide coverage in September 1995," Aplt. App. at 153, but modified its ruling at trial by holding preempted all claims arising after March 1, 1994, the date the insurance plan commenced. We review the trial court's ruling on ERISA preemption de novo as it involves a question of law. *See Airparts Co. v. Custom Benefits Serv. of Austin*, 28 F.3d 1062, 1064 (10th Cir. 1994).

The plain language of ERISA provides that it shall preempt state laws that "relate to any employment benefit plan," subject to enumerated exceptions. *See* 29 U.S.C. § 1144(a). The Supreme Court has frequently acknowledged the expansive scope of ERISA preemption, *see, e.g.*, *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138-39 (1990); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 (1987); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 98-99 (1983), yet the Court has also noted that this observation provides little aid in actually determining whether ERISA supersedes state law, *see, e.g.*, *New York State Conference of Blue Cross & Blue Shield v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995); *California Div. of Labor Stand. v. Dillingham*, 519 U.S. 316, 335-36 (1997) (Scalia, J., concurring). As the Court noted in *Travelers*:

> [O]ne might be excused for wondering, at first blush, whether the
> words of limitation . . . do much limiting. If "relate to" were taken

---

[1](...continued)
against it is preempted, and we do not consider that issue.

-7-

to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for "[r]eally, universally, relations stop nowhere," H. James Roderick Hudson xli (New York ed., World Classic's 1980). . . . That said, we have to recognize that our prior attempt to construe "relate to" does not give us much help in drawing the line here.

*Travelers Ins. Co.*, 514 U.S. at 655. The Court then offered another way of analyzing ERISA pre-emption: "We simply must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of ERISA as a guide to the scope of state law that Congress understood would survive." *Id.* at 656.

In enacting ERISA, Congress intended to "protect . . . the interests of participants in employee benefits plans and their beneficiaries . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies." 29 U.S.C. § 1001(b). Preemption of state law works toward that end by subjecting plans and plan sponsors to a uniform body of law and minimizing the administrative and financial burdens of complying with conflicting directives among states or between states and the federal government. *See Travelers Ins. Co.*, 514 U.S. at 656-57 (quoting *Ingersoll-Rand Co.*, 498 U.S. at 142). Congress defined a plan fiduciary as a person

> (i) [who] exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its

assets, (ii) [who] renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) [who] has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002 (21)(A).

This court has identified four causes of action that "relate to" a benefit plan for purposes of ERISA preemption. They involve 1) laws regulating the type of benefits or terms of ERISA plans; 2) laws creating reporting, disclosure, funding or vesting requirements for such plans; 3) laws providing rules for calculating the amount of benefits to be paid under such plans; and 4) laws and common-law rules providing remedies for misconduct growing out of the administration of such plans. *Airparts Co.*, 28 F.3d at 1064-65 (quoting *National Elevator Indus. v. Calhoon*, 957 F.2d 1555, 1558-59 (10th Cir. 1992)).

At the same time, this circuit recognizes that ERISA does not preempt all state law claims. It has no bearing on those "which do[] not affect the 'relations among the principal ERISA entities, the employer, the plan, the plan fiduciaries and the beneficiaries' as such." *Hospice of Metro Denver, Inc. v. Group Health Ins. of Okla. Inc.*, 944 F.2d 752, 756 (10th Cir. 1991) (quoting *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 249 (5th Cir. 1990)). "As a corollary, actions that affect the relations between one or more of these plan entities and an outside party similarly escape preemption." *Airparts Co.*, 28 F.3d

at 1065. While the scope of ERISA preemption may be broad, it is certainly not boundless. *See Monarch Cement Co. v. Lone Star Indus. Inc.*, 982 F.2d 1448, 1452 (10th Cir. 1992).

With these principles in mind we turn to the parties' claims. Essentially Principal Mutual argues that many courts, including this one, have held ERISA preempts fraudulent inducement claims and we should follow that precedent here. Principal Mutual concedes that courts have allowed employers' fraudulent inducement claims against insurance professionals, but contends those cases are inapposite because Principal Mutual is an insurance company, not an insurance professional. We disagree on both counts.

In the cases upon which Principal Mutual relies, the fraudulent inducement claims arise in a context factually distinguishable from the instant case. For example, several of the cases involve fraudulent inducement claims affecting relations between primary ERISA entities. *See, e.g.*, *Dedeaux*, 481 U.S. 41, 43-44 (1987) (employee sued plan fiduciary for failing to pay benefits); *DeBruyne v. Equitable Life Assurance Soc. of the United States*, 920 F.2d 457, 460-62 (7th Cir. 1990) (beneficiaries sued plan fiduciary). Principal Mutual's heavy reliance on *Maez v. Mountain States Tel. & Tel.*, 54 F.3d 1488 (10th Cir. 1995), is also misplaced. In *Maez*, plan beneficiaries sued the employer to recover benefits under the plan. *Id.* at 1492. As noted above, the allocation of

benefits under an employee benefits plan goes to the core of ERISA, and so such claims are usually preempted. *See Airparts Co.*, 28 F.3d at 1064-65.

We find instructive those cases in which an employer sued an insurance professional for misrepresentations that induced plan participation. At least four circuits have held that ERISA does not preempt such claims. *See Wilson v. Zoellner*, 114 F.3d 713, 721 (8th Cir. 1997) ("[W]e hold that ERISA does not preempt [plaintiff's] suit against [an insurance agent] for the Missouri state common-law tort of negligent misrepresentation."); *Coyne & Delaney Co. v. Selman*, 98 F.3d 1457, 1467 (4th Cir. 1996) ("We hold that [plaintiff's] malpractice claim [against the insurance professionals] is not preempted because it does not 'relate to' an employee benefit plan within the meaning of ERISA's preemption provision"); *Morstein v. National Ins. Serv., Inc.*, 93 F.3d 715, 723 (11th Cir. 1996) (en banc) ("When a state law claim involves the reliance on an insurer's promise that a particular treatment is fully covered under a policy, . . . a claim of promissory estoppel is not 'related to' the benefits plan."); *Perkins v. Time Ins. Co.*, 898 F.2d 470, 473 (5th Cir. 1990) ("[W]e conclude that a claim that an insurance agent fraudulently induced an insured to surrender coverage under an existing policy, to participate in an ERISA plan which did not provide

the promised coverage, 'relates to' that plan only indirectly.").[2]  The reasoning is two-fold:  first, by definition, the insurance professional cannot act as a plan fiduciary before the plan exists; and second, allowing preemption would not further Congress' purpose in passing ERISA.  *See Coyne & Delaney Co.*, 98 F.3d at 1466-71.

*Coyne & Delaney Co.* is particularly apposite to the instant case.  There, an employer sued insurance professionals under Virginia's malpractice law.  *See id.* at 1464.  The insurance professionals had misadvised the employer about employee benefit plans and had designed an inadequate plan for it.  *See id.* at 1461.  Once the plan went into effect, the insurance professionals served as the Plan Administrator and Plan Supervisor.  *See id.*  The Fourth Circuit rejected the defendants' claims that ERISA preempted the employer's claims, noting:

> Quite simply, Delany's claim is not aimed at a plan administrator at all since the defendants are sued in their capacities as insurance professionals for actions taken in that capacity.  Indeed, defendants' malpractice, if any, took place before they began to act in their capacities as Plan Administrator and Plan Supervisor.

*Id.* at 1471.

---

[2]  Two cases to the contrary relied on by Principal Mutual have subsequently been disavowed in their respective circuits.  Thus, in *Wilson v. Zoellner*, 114 F.3d 713, 721 n.4 (8th Cir. 1997), the Eighth Circuit declined to follow the dicta in *Consolidated Beef Indus., Inc. v. New York Life Ins. Co.*, 949 F.2d 960, 964 (8th Cir. 1991).  And in *Morstein v. National Ins. Servs., Inc.*, 93 F.3d 715, 717-18, 722 (11th Cir. 1996), the Eleventh Circuit en banc court overruled *Farlow v. Union Cent. Life Ins. Co.*, 874 F.2d 791 (11th Cir. 1989).

Similarly, Woodworker is suing Principal Mutual with respect to its pre-plan activity in its role as a seller of insurance, not as an administrator of an employee benefits plan. Principal Mutual does not, and cannot, claim that it was a principal ERISA entity before March 1, 1994. Of the four principal ERISA entities, the employer, the plan, the beneficiaries, and the plan fiduciaries, Principal Mutual could only claim to be the last. However, Congress quite logically defined a plan fiduciary in relation to a plan. If no plan exists, by definition plan fiduciaries cannot exist. Consequently, Woodworker's pre-March 1, 1994 claim is best characterized as a claim between an employer and an outside party not affecting relations between ERISA entities, as such. *See Airparts Co.*, 28 F.3d at 1065. That Principal Mutual may have later acted as a plan fiduciary does not alter its pre-plan status. *Cf. Coyne & Delaney*, 98 F.3d at 1471.

Allowing Woodworker's claims to proceed is consistent with Congress' purpose in enacting ERISA, that is, to protect the interests of employees and other beneficiaries of benefit plans and establish uniform standards regulating such plans. Holding insurers accountable for pre-plan fraud does not affect the administration or calculation of benefits, nor does it alter the required duties of plan fiduciaries. *See Wilson*, 114 F.3d at 719; *Coyne & Delaney Co.*, 98 F.3d at 1471. Conversely, were ERISA to preempt such claims, "employees, whom Congress sought to protect, [would] find themselves unable to make informed

-13-

choices regarding available benefit plans." *Morstein*, 93 F.3d at 723-24. We

agree with the Eighth Circuit's assertion that a state's "efforts to prevent sellers

of goods and services, including benefit plans, from misrepresenting . . . the

scope of their services is 'quite remote from the area with which ERISA is

expressly concerned–reporting, disclosure, fiduciary responsibility and the like.'"

*Wilson*, 114 F.3d at 720 (quoting *Dillingham*, 117 S. Ct. at 840).

Finally, we are not persuaded that Principal Mutual's status as an

insurance company mandates preemption.[3] We acknowledge that in the above-

cited cases plaintiffs were suing insurance professionals, as opposed to insurance

companies, but we fail to see how this makes a material difference. *See Camp v.

Pacific Fin. Group*, 956 F. Supp. 1541, 1546-47 n.4 (C.D. Cal. 1997). In enacting

ERISA, Congress intended to protect the integrity of employment benefit plans,

not insurance companies. It explicitly defined a plan fiduciary in terms of the

function it performed for the plan, not whether it was an insurance company.

Courts have repeatedly held that insurers are not necessarily ERISA entities. *See

Harris Trust & Sav. Bank v. Provident Life & Accident Ins. Co.*, 57 F.3d 608,

613-14 (7th Cir. 1995) (holding that insurance company was not a fiduciary as

---

[3] Principal Mutual argues that because claims against insurance
professionals are permitted, Woodworker could sue Ms. Shimada for fraud. That
suggestion ignores Woodworker's theory of the case: that Principal Mutual, not
Ms. Shimada, concealed material facts.

-14-

defined by ERISA and citing cases). Moreover, one circuit has indicated that an insurance company may suffer liability in a misrepresentation suit. *See Wilson*, 114 F.3d at 718 ("If Prudential incurs any liability as a result of this suit, it will do so only as the employer of a tortfeasor, and not as a plan fiduciary."). Quite simply, we see no principled basis for distinguishing insurance companies from insurance professionals in this type of action. We hold that ERISA does not preempt Woodworker's pre-plan fraud claims against its insurer, and affirm the district court on this point.

**B.      Admission of Woodworker's Damage Theory**

Principal Mutual contends that Woodworker failed to properly disclose its damage theory prior to trial and that the district court should have excluded its evidence of damages. Principal Mutual raises this claim under two theories: arguing first, that Fed.R.Civ.P. 37(c) mandated exclusion, and second, the court should have granted a new trial under Fed.R.Civ.P. 60(b)(3). We review evidentiary rulings and the disposition of Rule 60(b) motions for an abuse of discretion. *See Howard v. Mail-Well Envelope Co.*, 150 F.3d 1227, 1231 (10th Cir. 1998 ) (60(b) motions); *Orjias v. Stevenson*, 31 F.3d 995, 1005 (10th Cir. 1994) (evidentiary rulings under 37(c)). Under this standard, we will not reverse unless the trial court has made "an arbitrary, capricious, whimsical, or manifestly

unreasonable judgment." *FDIC v. Oldenburg*, 34 F.3d 1529, 1555 (10th Cir. 1994) (further quotations omitted).

In its complaint, Woodworker asked for "compensatory damages" for various offenses "in an amount to be proven at trial." Aplt. App. at 30-31. At trial, it asked for contract damages based on recission, the difference between the value it had received for the insurance and the purchase price. During its opening statement, Woodworker explained, "[w]e want that . . . difference between the amount we paid in premiums and the amount they paid in claims refunded to us." *Id.* at 442. Woodworker's pre-trial disclosures had been somewhat vague, however, and during a deposition Mr. John Wirth, president of Woodworker, did not fully explain that he would request such damages.

At trial, Principal Mutual objected when the attorney for Woodworker asked Mr. Wirth on direct examination about the amount his company had paid in premiums, but Principal Mutual did not request a continuance. The trial court overruled the objection without explanation, but offered Principal Mutual the right to question Mr. Wirth outside the presence of the jury prior to his cross-examination. *Id.* at 887-88. Principal Mutual apparently failed to take advantage of this opportunity. *See id.* at 891. Nevertheless, during cross-examination, Principal Mutual elicited from Mr. Wirth that his calculation of damages did not account for the administrative and other costs incurred by the insurance company.

-16-

Rule 37(c)(1) provides:

> [a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) [which govern initial disclosures and required supplements thereof] shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

"The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir. 1996). A district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose. *United States v. $9,041,598.68*, 163 F.3d 238, 252 (5th Cir. 1998). Nevertheless, the following factors should guide its discretion: 1) the prejudice or surprise to the party against whom the testimony is offered; 2) the ability of the party to cure the prejudice; 3) the extent to which introducing such testimony would disrupt the trial; and 4) the moving party's bad faith or willfulness. *See Newman v. GHS Osteopathic Inc.*, 60 F.3d 153 (3d Cir. 1995) (quoting *Bronk v. Ineichen*, 54 F.3d 425, 418 (7th Cir.1995)); *Cf. $9,041,598.68*, 163 F.3d at 252 (enumerating a similar list of factors to determine whether inclusion of last-minute evidence is harmless); *Smith v. Ford Motor Co.*, 626 F.2d 784, 797 (10th Cir. 1980) (applying these four factors to determine whether the district court abused its discretion in allowing testimony not specified in the pretrial order).

-17-

We assume arguendo that Woodworker improperly failed to disclose its damage theory. Even so, we are persuaded the admission of Woodworker's damage theory was harmless under the factors we must consider. First, Principal Mutual knew the numbers on which Mr. Wirth based his calculation; indeed, it provided the calculation for the amount it paid in premiums. Moreover, the district court gave Principal Mutual a significant opportunity to cure any resulting prejudice by cross-examining Mr. Wirth outside the presence of the jury. Principal Mutual failed to do so. After Mr. Wirth testified, Principal Mutual also called as a witness Ms. Lorek, an underwriter who was familiar with the administrative costs Principal Mutual incurred processing claims. Yet, it elicited no testimony on this subject matter. Nor did it argue to the district court that it needed more time to make this calculation. Finally, Woodworker's initial disclosures and Mr. Wirth's deposition occurred before the district court ruled that ERISA preempted a number of its claims. Those rulings no doubt prompted Woodworker to modify its damage theory. While this certainly does not excuse Woodworker from supplementing its disclosures, it reduces the likelihood that Woodworker acted in "bad faith" in varying its trial testimony from its deposition testimony. Under these circumstances, we hold the district court did not abuse its discretion under Rule 37 in permitting evidence of Woodworker's damage theory.

We now turn to Principal Mutual's Fed.R.Civ.P. 60(b)(3) claim based on

the same facts, and again assume arguendo that Woodworker's failure to disclose was improper. "[B]efore retrial is mandated under Rule 60(b)(3) in consequence of discovery misconduct, the challenged behavior must *substantially* have interfered with the aggrieved party's ability fully and fairly to prepare for and proceed at trial." *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 924 (1st Cir. 1988) (emphasis in original). Given Principal Mutual's opportunities to cure any prejudice flowing from Mr. Wirth's testimony, we cannot say with any certainty that Woodworker's failure to disclose substantially interfered with Principal Mutual's ability to proceed at trial. Accordingly, we hold that the district court was within its discretion in denying Principal Mutual's Rule 60(b)(3) motion, and we decline to grant a new trial on this basis.

## C. Sufficiency of the evidence

Principal Mutual contends that Woodworker presented insufficient evidence to support the jury's finding on the claims for violations of the New Mexico Unfair Practices Act, the Unfair Insurance Practices Act, fraudulent inducement, and damages. We view the evidence in the light most favorable to Woodworker, upholding the verdict if the record reveals sufficient evidence to support it. *See Acrey v. American Sheep Indus. Ass'n*, 981 F.2d 1569, 1572 (10th Cir. 1992). We discuss each claim in turn.

*1.	New Mexico Trade Practices Statutes*

Both the New Mexico Unfair Practices Act (UPA), N.M. STAT. ANN. §§ 57-12-1 *et. seq.*, and the New Mexico Unfair Insurance Practices Act (UIPA), N.M. STAT. ANN. §§ 59A-16-1 *et. seq.*, prohibit misleading or deceptive communications to consumers.  "[U]sing exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive" is unlawful under the UPA.  N.M. STAT. ANN.§ 57-12-2 (D) (14).  The UPA "applies to all misleading or deceptive statements, whether intentionally or unintentionally made."  *Ashlock v. Sunwest Bank of Roswell*, 753 P.2d 346, 348 (N.M. 1988), *overruled on other grounds by Gonzales v. Surgidev Corp.*, 899 P.2d 576, 583 (N.M. 1995).

The UIPA places similar restrictions on trade practices within the insurance business.  No person may "misrepresent[] the benefits, advantages, conditions or term of any policy," N.M. STAT. ANN.§ 59A-16-4 (A) or "fail[] to disclose material facts reasonably necessary to prevent other statements made from being misleading."  N.M. STAT. ANN.§ 59A-16-4 (G).

Woodworker presented evidence that Principal Mutual knew that the rates were inadequate prior to the time the agreement went into effect, and that Principal Mutual did not disclose its method for deciding whether to add a

surcharge to the preliminary premium or increase annual rates. Evidence in the record shows that had Woodworker had access to that information, it would not have contracted with Principal Mutual. We therefore hold sufficient evidence supports the UPA and UIPA claims.

*2.      Fraudulent Inducement*

Under New Mexico law, the elements for fraudulent inducement are 1) a misrepresentation of fact or failure to disclose a material fact; where 2) the falsity was known to the maker or where the representation or concealment was reckless; 3) the maker acted with the intent to deceive and to induce the other party to act in reliance; and 4) the other party actually relied on the representation or concealment. *See Lotspeich v. Golden Oil Co.*, 961 P.2d 790, 792 (N.M. Ct. App. 1998); *see also Krupiak v. Payton*, 561 P.2d 1345, 1346 (N.M. 1977). A party has the duty to disclose if he knows that the other party to a contemplated transaction is acting under a mistaken belief, or if he has superior knowledge not within the reach of the other party. *Krupiak*, 561 P.2d at 1346.

Woodworker presented evidence that supported its fraudulent inducement claim. First, as discussed above, Principal Mutual had superior knowledge about its calculation methods for the underrated premiums it had offered Woodworker. Principal Mutual contends it failed to disclose opinions, not facts. However, its

-21-

unusual calculation methods and the resultant hidden charges presumably led Ms.
Lorek to conclude the rates were inadequate. These underlying facts serve as the
basis for a fraud claim. In addition, a reasonable juror could infer that Principal
Mutual intentionally chose not to disclose the inadequacy of the proposed rates in
order to ensure it received Woodworker's business. Finally, Woodworker
presented evidence that it relied on Principal Mutual's concealment. We
therefore affirm the jury's finding of fraud.[4]

## 3.    *Damages*

Principal Mutual contends that Woodworker did not suffer any damages
because, at worst, Woodworker paid less in premiums than it should have. We
disagree. Woodworker presented considerable evidence that underrating
premiums and failing to disclose calculation methods can, and did, result in
unexpected retrospective collections and rate increases. Woodworker then
presented evidence of recission damages, an appropriate remedy for fraud. *See*
*Snell v. Cornehl*, 466 P.2d 94, 95-96 (N.M. 1970); *Montoya v. Moore*, 422 P.2d

---

[4] Because we uphold the jury's finding that the contract at issue was
procured by fraud, Principal Mutual has no right to collect under it. *See*
*Rodriguez v. Horton*, 622 P.2d 261, 265 (N.M. Ct. App. 1980). Consequently, we
deny Principal Mutual's counterclaim for $56,320, the surcharge on the 1994
preliminary premium.

363, 365 (N.M. 1967); FOWLER V. HARPER ET AL., 2 THE LAW OF TORTS § 7.15

(2d ed. 1986); *see also* 37 AM. JUR. 2D. *Fraud and Deceit* § 338 (1968).  Because

sufficient evidence existed to support the damage award, we uphold it.

**III.**

Woodworker raises several issues in its cross-appeal which we address in

turn.

**A.     Punitive damages**

Woodworker contends the district court erred in refusing to submit the

issue of punitive damages to the jury.  After both parties rested, Woodworker

requested that evidence pertaining to punitive damages be admitted.  The district

court denied the request, finding insufficient evidence to submit punitive damages

to the jury.  Aplt. App. at 1144-1145.[5]  We review this question of law de novo,

viewing the evidence in the light most favorable to Woodworker.  *See Oja v.*

*Howmedica, Inc.*, 111 F.3d 782, 792 (10th Cir. 1997).

Under New Mexico law, punitive damages may be awarded for conduct

---

[5]    Later, the district court noted the compensatory damage award alone was
sufficient to achieve the underlying policy rationale of awarding punitive
damages, that is, to encourage private citizens to undertake this type of litigation.
Aplt. App. at 201.

that is malicious, willful, reckless, wanton, fraudulent, or in bad faith. *See Gonzales v. Surgidev Corp.*, 899 P.2d 594, 597 (N.M. 1995); *Golden Cone Concepts v. Villa Linda Mall*, 820 P.2d 1323, 1328-29 (N.M. 1991); *Sanchez v. Wiley*, 946 P.2d 650, 655 (N.M. Ct. App. 1997). If sufficient evidence exists to prove any one of the enumerated mental states, the trial court is required to instruct the jury on punitive damages. *See Gilmore v. Duderstadt*, 961 P.2d 175, 184 (N.M. Ct. App. 1998). In *Flores v. Baca*, 871 P.2d 962, 964 (N.M. 1994), for example, the trial court refused to instruct the jury on punitive damages. On appeal, the New Mexico Supreme Court ordered a new trial on that issue because the jury could have inferred from the evidence that the defendant acted fraudulently. *Id*. at 968. Once a plaintiff presents sufficient evidence of a requisite mental state, the question of punitive damages belongs to the jury. Punitive damages are an appropriate sanction for common-law fraud. *Naranjo v. Paull*, 803 P.2d 254, 261-62 (N.M. 1991).

Here, the jury specifically found Principal acted willfully and committed fraud and therefore possessed the mental state required for a punitive damage award. We are sympathetic to the policy justifications the district court gave in explaining why it did not award punitive damages and would not award treble damages. However, the district court did instruct the jury on fraudulent inducement, and we have held that Woodworker presented sufficient evidence to

support such a finding. Under these circumstances, New Mexico law requires an instruction on punitive damages, if requested. *See, e.g.*, *Gilmore*, 961 P.2d at 184. Because substantial evidence supports the jury's finding of fraudulent inducement, we have no choice but to order a new trial on punitive damages.

**B.    Treble damages**

Woodworker argues that the district court also erred in refusing to treble its damage award. The New Mexico Unfair Trade Practices Act provides that "[w]here the trier of fact finds that the party charged with an unfair or deceptive trade practice . . . has willfully engaged in the trade practice, the court *may* award up to three times actual damages." N.M. STAT. ANN. § 57-12-10 (B) (emphasis added). The statute specifically makes the awarding of treble damages a discretionary act. We therefore review the court's decision not to award treble damages under an abuse of discretion standard. *Cf. Lam, Inc. v. Johns-Manville Corp.*, 668 F.2d 462, 476 (10th Cir. 1982) (reviewing for abuse of discretion an award of treble damages and attorney's fees granted under statute providing the court "may" award successful party such fees).

Here, the jury expressly found that Principal Mutual's conduct was willful, so the district court had the option to grant treble damages. However, "[g]iven the record in the case and other remedies awarded," it declined to do so.

Aplt. App. at 202. We are not persuaded the district court abused its discretion in denying Woodworker treble damages.

**C.      Liability for post-March 1, 1994 Conduct**

Woodworker contends the district court erred in instructing the jury that it could only find liability for Principal Mutual's conduct occurring before the commencement of the insurance plan on March 1, 1994, with respect to the fraudulent inducement, the UPA, and the UIPA claims. On cross-appeal, Woodworker asks us to reverse this decision in the event we order a new trial on liability or damages. Woodworker provides no separate argument on this issue, however, and we are at a loss to determine either from its briefs on appeal or from the record below what alleged post-plan conduct of Principal Mutual's relates to these three claims. Woodworker specifically disclaims any intent to appeal the district court's dismissal of its claims for breach of contract, defamation, bad faith, and prima facie tort, which claims primarily were based on conduct occurring after March 1, 1994. *See* Br. of Aplee./Cross-Aplt. at 2. Under these circumstances, we decline to address this argument.

**D.      Attorney's Fees and Costs on Appeal.**

Woodworker also argues that it is entitled to attorney's fees and costs on appeal.  The New Mexico Unfair Trade Practices Act mandates an award of costs and attorney's fees to prevailing plaintiffs.  N.M. STAT. ANN. § 57-12-10 (C). The New Mexico Supreme Court has ruled that this provision applies to costs and fees incurred on appeal as well as at trial.  *See Hale v. Basin Motor Co.*, 795 P.2d 1006, 1013-1014 (N.M. 1990).  Woodworker is therefore entitled to such fees. On remand, the district court should award Woodworker attorney's fees for litigating this appeal.

# IV.

We **REVERSE** the district court's denial of punitive damages and **REMAND** this case for a new trial on that issue.  We **AFFIRM** on all other issues.