USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 99-1362

 CONSTANTINE L. HAMPERS, M.D.,

 Plaintiff, Appellant,

 v.

 W.R. GRACE & CO., INC., 
 W.R. GRACE & CO.-CONN., INC.,
 NATIONAL MEDICAL CARE, INC.,
 FRESENIUS NATIONAL MEDICAL CARE HOLDINGS, INC.,

 Defendants, Appellees.

 

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS
 
 [Hon. W. Arthur Garrity, Jr., Senior U.S. District Judge]
 
 
 
 
 Before
 
 Stahl, Circuit Judge,
 Cyr, Senior Circuit Judge,
 and Lipez, Circuit Judge. 
 
 
 
 
 D. Lloyd Macdonald, with whom Andrew C. Glass and Kirkpatrick
& Lockhart, LLP were on brief for appellant.

 Michael R. Pontrelli, with whom Thomas Elkind, Lawrence M.
Kraus, and Epstein, Becker and Green, P.C. were on brief for
appellees.

January 28, 2000

 LIPEZ, Circuit Judge. This appeal requires us to decide
whether the Employee Retirement Income Security Act of 1974
("ERISA") as amended, 29 U.S.C. 1001 et. seq., preempts a common
law cause of action for lump sum contract damages where the alleged
breach involves the failure of a former employer to enroll the
plaintiff in an ERISA-regulated employee pension benefit plan. The
plaintiff, Dr. Constantine Hampers, demanded a jury trial on his
common law breach of contract claims against defendants, W.R. Grace
and Company, W.R. Grace and Company-Connecticut, (collectively,
"Grace"), National Medical Care, Inc. ("NMC"), and Fresenius
National Medical Care Holdings, Inc. ("Fresenius"). The district
court rejected his demand, finding that ERISA preempted Hampers's
state law claims. On appeal, Hampers argues that, with respect to
defendant Grace, the trial court erred in finding his claim
preempted. For the reasons stated below, we affirm. 

 I. BACKGROUND
 In 1968, as an associate professor at the Harvard Medical
School and a nephrologist specializing in end-stage renal disease,
Hampers co-founded NMC, a company that provides dialysis treatment
to patients through private clinics. In a series of transactions
between 1984 and 1989, Grace purchased a 100 percent equity
interest in NMC, and began operating it as a wholly-owned
subsidiary. In 1989, Hampers negotiated an employment agreement
that, among other things, provided for his participation in the
National Medical Care, Inc., Retirement Plan (the "NMC qualified
plan").
 In 1990, J.P. Bolduc became president and chief operating
officer of Grace, and he invited Hampers to become an executive
vice president of Grace and director of its health care group,
which included NMC. On February 22, 1991, Bolduc sent a letter to
Hampers proposing terms for a new employment agreement with Grace
that was to include membership in the W.R. Grace & Co. Retirement
Plan for Salaried Employees (the "Grace qualified plan") and the
W.R. Grace & Co. Supplemental Executive Retirement Plan (the "Grace
SERP"). This agreement provided Hampers with more benefits than
he was previously entitled to under the NMC qualified plan because
at that time NMC did not have a supplemental executive retirement
plan (SERP) of its own.
 Hampers and Bolduc decided that the February 22 letter
would be the basis of their agreement, and they turned the drafting
over to their attorneys. Before the agreement was executed,
however, Grace identified a problem with the proposed benefit
scheme: Hampers's participation in the Grace qualified plan could
jeopardize the plan's tax-preferred status. Accordingly, Grace's
lawyers redrafted the agreement, providing Hampers with a cash
benefit equal to what they estimated he would have received under
the Grace qualified plan and Grace SERP. 

 Although these changes were acceptable to Hampers, 
Grace's Salary, Incentive Compensation and Employee Benefits
Committee found the terms too rich and refused to approve them. 
Instead, the compensation committee, and ultimately Grace's board
of directors, approved a modified version of the agreement which
capped Hampers's retirement benefits at $300,000 per year. Hampers
reluctantly accepted the modified terms, and Grace's lawyers
reduced them to writing, providing that Hampers's pension 
 shall be equal to the amount by which (a) the
 lesser of (i) three times the actual pension
 benefit payable to him under NMC's retirement
 plan (beginning in the year in which he
 terminates employment with Grace) or (ii)
 $300,000 exceeds (b) the amount of the actual
 pension benefit payable to him under NMC's
 retirement plan at that time. 

In July 1991, Hampers and Bolduc executed the agreement (the "1991
Agreement").
 Four years later, NMC's earnings had skyrocketed, and NMC
employees demanded a richer benefits package. In response, Grace's
board created in November 1995 the "National Medical Care, Inc.
Supplemental Executive Retirement Plan" (the "NMC SERP"). In
1996, Grace transferred ownership of NMC to Fresenius. On June 14,
1996, Hampers retired. Upon retirement, Hampers inquired about
his retirement benefits. He learned from Grace that he was not a
participant in the NMC SERP. He also learned that if he had been
a participant in the NMC SERP, his aggregate retirement annuity
(from the combined NMC qualified plan and NMC SERP) would have
totaled more than $500,000. On January 2, 1997, Hampers filed the
present suit, asserting that he was wrongly denied participation in
the NMC SERP. 
 In his complaint, Hampers contended that "when a SERP for
NMC senior executives . . . was created in or about November 15,
1995, Grace caused Dr. Hampers to be excluded from the NMC SERP,
and NMC so excluded Dr. Hampers." According to Hampers, this
exclusion was a breach of the 1991 Agreement because under that
agreement he was "entitled to the full pension benefits of the NMC
retirement plan as it existed on the date of his retirement,
specifically including such benefits under the NMC qualified plan
and the NMC SERP." In his view, the reference in the 1991
Agreement to "NMC's retirement plan" entitled him to participate,
not only in the NMC qualified plan, which existed at the time of
contracting, but also in any additional retirement benefits that
Grace might establish for NMC in the future. 
 In a count of the complaint titled "ERISA: The NMC SERP,"
Hampers asserted that the "NMC SERP is an 'employee benefits plan'
under ERISA," and Grace "exercised and exercise[s] discretion and
authority or control respecting the management, disposition and
administration of the NMC SERP, including but not limited to, the
discretion of who is to be included for participation in the NMC
SERP." Thus, Hampers contended, "[b]y virtue of the terms of the
1991 Agreement," Grace had a "duty to include Dr. Hampers as a
participant in the NMC SERP," and "breached the duty." 
 Hampers sought a declaration that he is a participant in
the NMC SERP and an order directing his enrollment in the NMC SERP
with annuity disbursements adjusted to reflect such participation. 
Hampers also requested "damages for the loss caused by [the
defendants'] illegal conduct, including interest, costs and
attorneys [sic] fees pursuant to 29 U.S.C. 1132(g) [ERISA 
502(g)] and other applicable provisions of law." Finally, Hampers
demanded a jury trial on all matters triable before a jury.
 The defendants moved for summary judgment on the grounds
that the 1991 Agreement contained no promise of participation in
any future NMC SERP. In opposition to the motion, Hampers argued
that the term "NMC retirement plan" in the 1991 Agreement could not
be construed to leave out future participation in the NMC SERP, as
"[b]y its very terms, the NMC SERP is inextricably linked to and
dependent on the Qualified Plan." Indeed, he argued, eligibility
for the NMC SERP depends on a formula that includes benefit accrual
under the NMC qualified plan. As the only purpose of the SERP is
to confer enhanced benefits on highly compensated executives
without contravening the limits on qualified plans set by the tax
code, Hampers contended that the two plans must be construed
together to comprise one seamless retirement package. In the end,
the district court denied summary judgment, finding that there was
"more than one reasonable construction of the term 'NMC retirement
plan.'" 
 The defendants then moved to strike Hampers's demand for
a jury trial on the grounds that the NMC SERP was an ERISA plan and
that ERISA preempted Hampers's state law cause of action. 
Characterizing the issue as a "close question," the district court
granted the defendants' motion, ruling that ERISA preempted
Hampers's state law contract claims.
 The court then conducted a ten day bench trial at which
the defendants disputed Hampers's reading of the 1991 Agreement,
arguing that the term "NMC retirement plan" referred to the NMC
qualified plan, the plan that existed at the time of contracting,
and did not promise inclusion in a future NMC SERP as Hampers
contended. At the conclusion of the trial, the district court,
invoking principles of New York state contract law, found no
evidence that the parties intended Hampers's retirement benefits to
include benefits under the NMC SERP, and entered a judgment in
favor of the defendants. On appeal, Hampers does not contest the
district court's application of contract law; rather, he argues
that the trial court erred in denying his demand for a jury trial
on his claim for lump sum contract damages against defendant Grace. 
Because the district court's denial of Hampers's request for a jury
trial resulted from its legal ruling that his claim was preempted
by ERISA, we review the trial court's decision de novo. See Golas
v. Homeview Inc. 106 F.3d 1, 4 (1st Cir. 1997) (Bownes, J.,
concurring); Carlo v. Reed Rolled Thread Die Co., 49 F.3d 790, 792-
93 (1st Cir. 1995). 

 II. ERISA PREEMPTION
A. General Principles
 As noted, this case requires us to decide whether ERISA's
preemption clause applies to Hampers's state law cause of action. 
That preemption clause, section 514(a), 29 U.S.C. 1144(a),
provides:
 Except as provided in subsection (b) of this
 section, the provisions of this subchapter . . 
 . shall supersede any and all State laws
 insofar as they may now or hereafter relate to
 any employee benefit plan . . . .

(emphasis added). "The term 'State law' includes all laws,
decisions, rules, regulations, or other State action having the
effect of law, of any State." ERISA 514(c)(1), 29 U.S.C. 
1144(c)(1). Discerning the meaning of 514(a) requires us to
construe the language of a congressional statute. Therefore,
"[t]he question whether a certain state action is pre-empted by
federal law is one of congressional intent." Ingersoll-Rand Co. v.
McClendon, 498 U.S. 133, 137-38 (1990) (internal quotation marks
and citation omitted). Express "ERISA preemption analysis . . .
involves two central questions: (1) whether the plan at issue is an
'employee benefit plan' and (2) whether the cause of action
'relates to' this employee benefit plan." McMahon v. Digital Equip.
Corp., 162 F.3d 28, 36 (1st Cir. 1998). Because the NMC SERP is an
ERISA-regulated "employee benefit plan," our preemption analysis
focuses on whether Hampers's cause of action "relates to" the NMC
SERP. 
 In adopting 514(a), Congress deliberately rejected
narrower preemption language directed at "state laws relating to
the specific subjects covered by ERISA," Shaw v. Delta Air Lines,
Inc., 463 U.S. 85, 98 (1983) (emphasis added), choosing instead to
supplant all state laws that "relate to" ERISA-regulated plans. In
Shaw, the Supreme Court observed that "[a] law 'relates to' an
employee benefit plan, in the normal sense of the phrase, if it has
a connection with or reference to such a plan." Id. This "early
attempt[] by the Supreme Court to interpret ERISA's preemption
clause relied heavily upon textual analysis and a dictionary
definition of 'relate to,'" Plumbing Indus. Bd., Plumbing Local
Union No. 1 v. Howell Co., 126 F.3d 61, 66 (2d Cir. 1997), and led
to the conclusion that ERISA preemption was "conspicuous for its
breadth," FMC Corp. v. Holliday, 498 U.S. 52, 58 (1990). Indeed,
ERISA preempts a state law that has a connection with or refers to
an ERISA-regulated benefits plan, "even if the law is not
specifically designed to affect such plans, or the effect is only
indirect and even if the law is consistent with ERISA's substantive
requirements." District of Columbia v. Greater Washington Bd. of
Trade, 506 U.S. 125, 130 (1992) (internal quotation marks and
citations omitted); see also Rosario-Cordero v. Crowley Towing &
Transp. Co., 46 F.3d 120, 123 (1st Cir. 1995) ("[A] state law may
relate to an employee benefit plan even though the law does not
conflict with ERISA's own requirements . . . ."). 
 Yet, from ERISA's inception, the Supreme Court 
recognized that "[s]ome state actions may affect employee benefit
plans in too tenuous, remote, or peripheral a manner to warrant a
finding that the law 'relates to' the plan," Shaw, 463 U.S. at 100
n.21, and that such "is the case with many laws of general
applicability," Greater Washington Bd. of Trade, 506 U.S. at 130
n.1. Drawing the line between those state laws that "relate to"
ERISA-regulated plans, and those that are only "tenuous, remote, or
peripheral" has proven considerably difficult in practice,
producing an "avalanche of litigation." De Buono v. NYSA-ILA Med.
& Clinical Serv. Fund, 520 U.S. 806, 809 n.1 (1997) (collecting
Supreme Court ERISA preemption cases and documenting the enormous
volume of cases in the lower federal courts). This case calls upon
us to once again draw such a line.
 In drawing that line, we find cases emphasizing ERISA's
carefully crafted civil enforcement scheme particularly relevant. 
See, e.g., Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 54 (1987);
Ingersoll-Rand, 498 U.S. at 143-44; Fitzgerald v. Codex Corp., 882
F.2d 586, 588 (1st Cir. 1989) (concluding that preemption extends
to "causes of action within the scope of the civil enforcement
provisions of ERISA."). In Pilot Life, the Supreme Court concluded
that "[t]he deliberate care with which ERISA's civil enforcement
remedies were drafted and the balancing of policies embodied in its
choice of remedies argue strongly for the conclusion that ERISA's
civil enforcement remedies were intended to be exclusive." Id. at
54 (emphasis added). The Court explained:
 In sum, the detailed provisions of 502(a)
 set forth a comprehensive civil enforcement
 scheme that represents a careful balancing of
 the need for prompt and fair claims settlement
 procedures against the public interest in
 encouraging the formation of employee benefit
 plans. The policy choices reflected in the
 inclusion of certain remedies and the
 exclusion of others under the federal scheme
 would be completely undermined if ERISA-plan
 participants and beneficiaries were free to
 obtain remedies under state law that Congress
 rejected in ERISA.

Id. 
 Similarly, in Turner v. Fallon Community Heath Plan, 127
F.3d 196 (1st Cir. 1997), we found state common law claims 
preempted after determining that they fell within ERISA's exclusive
civil enforcement regime. The plaintiff brought breach of contract
and other state law claims, and a claim under ERISA 502(a)(1)(B),
29 U.S.C. 1132(a)(1)(B), against a health maintenance
organization, charging that it wrongly denied a request to fund a
certain cancer treatment. See id. at 197-98. The plaintiff sought
compensatory damages, arguing "that if ERISA provided no federal
[damages] remedy, it ought not be read to preempt his state-law
claims;" alternatively, "if ERISA preempted the state-law claims,
then a federal remedy ought to be inferred or created by the court
to permit damages for wrongful withholding of treatment under the
employee benefits plan." Id. at 198. We rejected both arguments,
finding the state law claims preempted and declining the
plaintiff's invitation to fashion a federal remedy not authorized
by ERISA's remedial scheme. See id. at 198-200. First, we
concluded that ERISA 501(a)(1)(B), 29 U.S.C. 1132(a)(1)(B),
provides a remedy to "secure benefits under the plan rather than
damages for a breach of the plan." Id. at 198 (emphasis added). 
We noted that "the Supreme Court has stressed that ERISA does not
create compensatory or punitive damage remedies where an
administrator of a plan fails to provide the benefits due under
that plan." Id. (citing Massachusetts Mut. Life Ins. Co. v.
Russell, 473 U.S. 134, 147 (1985)). We emphasized that Congress's
decision not to allow causes of action for damages under ERISA "is
not a minor technicality: damage awards may increase effective
coverage but may also add significantly to the costs of coverage." 
Id. at 198-99. Second, we held that although "[a]bsent preemption,
a health benefits plan . . . could certainly be treated as a
contract enforceable under state law and subject to the usual
contractual remedies, including compensatory damages," ERISA's
preemption clause "preclude[s] state claims to enforce rights under
an ERISA plan or obtain damages for the wrongful withholding of
those rights." Id. at 199. 
 While we acknowledged in Turner that the Supreme Court
has "set some new limits on preemption," we stressed that ERISA
continues to preempt "a state's attempt to provide state remedies
for what is in essence a plan administrator's refusal to pay
allegedly promised benefits." Id. at 199. Such reasoning is
consistent with, and indeed supported by New York State Conference
of Blue Cross & Blue Shield Plans v. Travelers Insurance Co., 514
U.S. 645, 656 (1995), the case in which the Supreme Court first
acknowledged the unworkability of a literal reading of ERISA 
514(a)'s "relate to" standard, and ruled that courts must "look
instead to the objectives of the ERISA statute as a guide to the
scope of the state law that Congress understood would survive."
According to the Travelers Court, ERISA's purpose was "'to ensure
that plans and plan sponsors would be subject to a uniform body of
benefits law.'" Id. at 656 (quoting Ingersoll-Rand, 498 U.S. at
142). The Court identified three categories of state laws that
"relate to" ERISA plans in such a way that preemption of those laws
furthers this purpose: (1) state laws that "mandate[] employee
benefit structures or their administration," (2) state laws that
"bind plan administrators to [a] particular choice," and (3) state
law causes of action that provide "alternative enforcement
mechanisms" to ERISA's enforcement regime. See id. at 658-59. The
third category has particular relevance for our present inquiry. In
this vein, we have stated that in order to assess whether the state
law cause of action is an alternative enforcement mechanism, we
must "look beyond the face of the complaint" and determine the real
nature of the claim "regardless of plaintiff's . . .
characterization." Danca v. Private Health Care Sys., Inc., 185
F.3d 1, 5 (1st Cir. 1999). 

B. Hampers's State Law Contract Claim
 Hampers's complaint alleged a cause of action under ERISA
based on precisely the same conduct that underlies his state law
contract claim. In particular, in Count III of the complaint,
entitled "ERISA: The NMC SERP," Hampers asserted that by virtue of
the 1991 Agreement, Grace had a "duty to include Hampers as a
participant in the NMC SERP," and breached that duty by "causing
him to be excluded from the NMC SERP." In Count II of the
complaint, entitled, "Contract: Retirement Benefit," Hampers argued
that under the terms of the 1991 Agreement with Grace he was
"entitled to the full pension benefits of the NMC retirement plan
as it existed on the date of his retirement, specifically including
such benefits under the NMC qualified plan and the NMC SERP." 
Hampers contended that "when a SERP for NMC senior executives . .
. was created in or about November 15, 1995, Grace caused Dr.
Hampers to be excluded from the NMC SERP, and NMC so excluded Dr.
Hampers." According to Hampers, this conduct constituted a breach
of the 1991 Agreement. That the very same conduct--Grace's failure
to include Hampers in the NMC SERP--underlies both Hampers's state
law contract claim and his ERISA-benefits claim suggests that the
state law claim is an alternative mechanism for obtaining ERISA
plan benefits.
 As relief, Hampers primarily sought benefits under the
NMC SERP. First, he sought a declaratory judgment that he is
"entitled to participate in the NMC SERP and is entitled to receive
all such benefits as to which he is entitled under the NMC SERP,"
and he petitioned the court to "order that Grace . . . cause
Hampers to be enrolled in the NMC SERP forthwith and cause the NMC
SERP to disburse to Hampers his rightful annuity as of January 1,
1997 at such amount as he would have been entitled to had Hampers
been included in the SERP from the day of its creation on or about
November 15, 1995." Moreover, even with respect to Hampers's state
law claim for contract damages, he asserts that "upon a Jury's
finding that Grace is liable to Dr. Hampers under the 1991
Agreement . . . [,] the district court [would] have to face the
issue of the appropriateness of an injunctive order directed to NMC
and Fresenius that they enroll Hampers in the NMC SERP." 
 Hampers's complaint requested "damages for the loss
caused by [the defendants'] illegal conduct, including interest,
costs and attorneys [sic] fees pursuant to 29 U.S.C. 1132(g)
[ERISA 502(g)] and other applicable provisions of law." Hampers
therefore linked his claim for damages to a request for attorneys'
fees authorized under ERISA, but not authorized under state law.
Moreover, in attempting to prove the "illegal conduct"--Grace's
decision to deny him participation rights in the NMC SERP--Hampers
relied on the terms of the NMC SERP, arguing that because the SERP
defines its benefits with respect to the NMC qualified plan, the
term "NMC retirement plan" in the 1991 Agreement must include both
the qualified plan and the SERP. We have consistently held that a
cause of action "relates to" an ERISA plan when a court must
evaluate or interpret the terms of the ERISA-regulated plan to
determine liability under the state law cause of action. See
McMahon v. Digital Equip. Corp., 162 F.3d. 28, 38 (1st Cir. 1998);
Boston Children's Heart Found., Inc. v. Nadal-Ginard, 73 F.3d 429,
440 (1st Cir. 1996); Carlo v. Reed Rolled Thread Die Co., 49 F.3d
790, 793-94 (1st Cir. 1995); Vartanian v. Monsanto Co., 14 F.3d
697, 698-99 (1st Cir. 1994). Finally, Hampers measured his damages
by reference to the NMC SERP, contending that, as a participant, he
would have been entitled to approximately $250,000 per year in
additional annual pension benefits. We have held that ERISA
preempts state law causes of action for damages where the damages
must be calculated using the terms of an ERISA plan. See Carlo, 49
F.3d at 794. 
 Hampers concedes that as against defendants NMC and
Fresenius, his breach of contract claim is properly preempted
because "the relief he seeks is inclusion in the NMC SERP." As
against Grace, however, Hampers insists that he "must necessarily
and exclusively seek money damages due to the fact that Grace no
longer has any authority or control over the NMC SERP," having
transferred its ownership of NMC to Fresenius in August 1996 and
relinquished all administrative duties relating to the NMC SERP. 
Thus, Hampers admits that his claim against Grace would have been
preempted if Grace had not, subsequent to the time of its alleged
breach of the 1991 Agreement, relinquished its responsibility over
the NMC SERP.
 The mere fortuity that Grace, subsequent to the
occurrence of the conduct at issue in this case, relinquished its
responsibility over the NMC SERP does not affect the ERISA
preemption analysis. Hampers's claim is directed at Grace's
alleged breach of its promise to enroll him in the NMC SERP. 
Specifically, Hampers argues that under the 1991 Agreement he was
"entitled to the full pension benefits of the NMC retirement plan
as it existed on the date of his retirement, specifically including
such benefits under the NMC qualified plan and the NMC SERP," but
that "Grace caused Dr. Hampers to be excluded from the NMC SERP,
and NMC so excluded Dr. Hampers." Thus, the wrongful conduct
alleged by Hampers involves a determination of whether benefits
will be paid under an ERISA-governed plan. In deciding not to
enroll Hampers in the NMC SERP, Grace was acting in its capacity as
an ERISA employer and fiduciary with responsibility over the
administration of the plan. If Grace had not exercised
"discretion and authority or control respecting the management,
disposition and administration of the NMC SERP, including but not
limited to, the discretion of who is to be included for
participation in the NMC SERP," as Hampers asserted in his
complaint, Grace simply could not have been in breach by failing to
use its "discretion," "authority," or "control" to include Hampers
in the SERP.
 Thus, it is only by virtue of Grace's status as an ERISA
employer with direct control over the administration and operation
of the NMC SERP that Grace could have breached the 1991 Agreement
in the way Hampers insists that it did. Consequently, this is not
a case where the defendant is being sued for wrongful conduct
committed in its individual capacity, see, e.g., Wilson v.
Zoellner, 114 F.3d 713, 715 (8th Cir. 1997) (claim of
misrepresentation against an insurance agent); Stetson v. PFL Ins.
Co., 16 F. Supp. 2d 28, 29 (D. Me. 1998) (same); see also Golas v.
Homeview Inc., 106 F.3d 1, 4 (1st Cir. 1997) (Bownes, J.,
concurring) (claim brought against insurance broker acting in his
individual capacity), nor is this a case where the defendant is a
third party insurer or service provider who is not an ERISA entity-
-plan, employer, participant, beneficiary, fiduciary--at all, see,
e.g., Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.,
170 F.3d 985, 991 (10th Cir. 1999) (claims against insurer for
misconduct in selling life insurance); Geweke Ford v. St. Joseph's
Omni Preferred Care, Inc., 130 F.3d 1355, 1357 (9th Cir. 1997)
(contract claims against third party provider of insurance and
administrative services); Arizona State Carpenters Pension Trust
Fund v. Citibank Arizona, 125 F.3d 715, 717-18 (9th Cir. 1997)
(claims against bank providing custodial services); Coyne & Delany
Co. v. Selman, 98 F.3d 1457, 1460-61 (4th Cir. 1996) (malpractice
claim against insurance professionals). 

C. Conclusion
 In summary, we conclude that Hampers's state law contract
claim against Grace "relates to" the NMC SERP within the meaning of
ERISA's preemption clause because Hampers's state law claim is an
alternative to his claims for NMC SERP benefits against Grace, NMC,
and Fresenius brought under ERISA. We base this conclusion on
these factors: (1) Hampers's state law claim against Grace alleges
precisely the same conduct that underlies his claims for SERP
benefits under ERISA; (2) the relief requested by Hampers focuses
primarily on NMC SERP benefits; (3) finding Grace liable for breach
of contract might require the court to order the NMC SERP to pay
plan benefits; (4) the only claim for damages in the complaint is
linked to a request for attorneys' fees under ERISA; (5) Hampers
calculates the amount of his alleged damages by reference to the
NMC SERP; (6) the central liability question at issue in his state
law claim against Grace--whether the 1991 Agreement promised him
inclusion in the NMC SERP must be viewed in light of the terms of
the NMC SERP and the NMC qualified plan; and (7) Grace's decision
to deny Hampers participation rights in the ERISA-regulated plan--
the conduct at issue in the state law claim--resulted from a
decision made by Grace in its capacity as an ERISA employer with
responsibility and authority over the ERISA-regulated plan. 
Accordingly, the district court did not err in finding Hampers's
state law claim against Grace preempted and denying his demand for
a jury trial. 
 Affirmed.