**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 5, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

MAIDA HENDERSON and KEN
STOLLER, M.D., as Co-Personal
Representatives of the Estate of Galen
Stoller, a minor child; MAIDA
HENDERSON, as mother of Galen
Stoller, deceased,

     Plaintiffs-Appellants,

v.

NATIONAL RAILROAD
PASSENGER CORPORATION, d/b/a
AMTRAK; BURLINGTON
NORTHERN SANTA FE
CORPORATION, a/k/a BNSF;
BOARD OF COUNTY
COMMISSIONERS FOR SAN
MIGUEL COUNTY; SAN MIGUEL
COUNTY; DOES I-X,

     Defendants-Appellees.

No. 09-2173

(D.C. No. 2:08-CV-00298-RLP-RHS)
(D.N.M.)

ORDER AND JUDGMENT[*]

Before **BRISCOE**, **BALDOCK,** and **TYMKOVICH**, Circuit Judges.


Sixteen-year-old Gallen Stoller was killed at a private railroad crossing when

an Amtrak passenger train hit the vehicle he was driving on a county road in Rowe,

---

[*] This order and judgment is not binding precedent except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however,
for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

New Mexico. His parents, Plaintiffs Maida Henderson and Ken Stoller, filed a wrongful death suit in New Mexico state court against Defendants Amtrak, Burlington Northern & Santa Fe Railroad Corporation ("BNSF"), and San Miguel County. In their complaint, Plaintiffs alleged negligence and gross negligence in the operation of the train as well as in the design, construction, and maintenance of the crossing, the railroad right-of-way, and/or the county road leading to the crossing.

Defendants successfully removed the matter to federal court based on Amtrak's status as a federal entity. Following some discovery, Plaintiffs filed a motion to dismiss Amtrak voluntarily from the case and to remand the matter to state court. Defendants BNSF and San Miguel County opposed remanding the case. The district court denied Plaintiffs' motion to remand but granted their motion to dismiss Amtrak without prejudice. BNSF and San Miguel County later filed separate motions for summary judgment on the merits. BNSF also moved to strike Plaintiffs' Rule 26 "preliminary" and "supplemental" expert reports and to preclude that expert from testifying at trial. The court held a hearing on the matter and ultimately granted BNSF's motion to strike and motion for summary judgment, refusing to consider either the expert's preliminary or supplemental report in granting BNSF's motion for summary judgment. The court subsequently granted San Miguel County's motion for summary judgment in a separate order. Plaintiffs seek to overturn all of these adverse rulings, including the denial of their motion to remand, on appeal. Exercising appellate jurisdiction under 28 U.S.C. § 1291, we affirm in part and

2

reverse in part.

I.

We first address the propriety of the district court's refusal to remand the case. Plaintiffs argue 28 U.S.C. §§ 1447(c) and 1367(c)(3) required the district court to remand the case to state court once it dismissed the only claim that provided federal subject matter jurisdiction—Plaintiffs' claim against Amtrak. We have "jurisdiction over a denial of a motion to remand to state court when coupled with the appeal of a final judgment" such as the district court's grant of Defendants' motions for summary judgment. Huffman v. Saul Holdings Ltd. P'ship, 194 F.3d 1072, 1076 (10th Cir. 1999) (internal quotations omitted).

Upon removal, the district court had subject matter jurisdiction over Plaintiffs' claims against Amtrak under 28 U.S.C. § 1331 and 28 U.S.C. § 1349 because Congress created Amtrak and the United States owns over fifty percent of its stock. See 49 U.S.C. §§ 24101–24711 (creating Amtrak). "Federal question jurisdiction exists for congressionally incorporated corporations under 28 U.S.C. § 1331. The limitation to this basis of jurisdiction found in 28 U.S.C. § 1349 . . . does not apply to congressionally incorporated entities, such as Amtrak, more than half of whose capital stock is owned by the federal government. . . . [F]ederal courts have jurisdiction over all cases involving Amtrak, regardless of the cause of action." Aliotta v. Nat'l R.R. Passenger Corp., 315 F.3d 756, 758 n. 1 (7th Cir. 2003) (internal citations omitted). Accord Vasquez v. N. Cnty. Transit Dist., 292 F.3d 1049, 1060

3

(9th Cir. 2002); Chiwewe v. Burlington N. & Santa Fe Ry. Co., 2002 WL 31924776, *2 (D.N.M. Aug. 21, 2002). Plaintiffs' negligence claims against Amtrak, BNSF, and San Miguel County all stemmed from their son's fatal collision with an Amtrak train on a BNSF crossing accessed by a San Miguel County road. The district court, as a result, had supplemental jurisdiction under § 1367(a) over Plaintiffs' state-law claims against BNSF and San Miguel County because they were "so related to claims in the action within such original jurisdiction that they form[ed] part of the same case or controversy under Article III." 28 U.S.C. § 1367(a).

After removal, but well before final judgment, Plaintiffs voluntarily dismissed their claims against Amtrak. Section 1447(c) provides, in relevant part: "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, [a removed] case shall be remanded."[2] Plaintiffs contend this language required the district court to remand the case to state court once its claims against Amtrak, the sole basis for federal jurisdiction, had been dismissed. This is not necessarily an unreasonable argument given the statutory language, but it is one that

---

[2] Prior to 1988, Section 1447(c) provided: "If at any time before final judgment it appears that the case was removed improvidently and without jurisdiction, the district court shall remand the case, and may order the payment of just costs." Based in part on that statutory language, the Supreme Court in Carnegie-Mellon University v. Cohill, 484 U.S. 343, 351–52 (1988), held that a district court possesses the discretion to remand to state court or retain jurisdiction of a removed civil action once the single claim providing federal jurisdiction has been eliminated and only state-law claims remain to be decided. But then Congress changed the text of § 1447(c) to its present form.

most courts to our knowledge have found unpersuasive.[3]  And, in any event, it is one that the Supreme Court certainly foreclosed in <u>Carlsbad Technology, Inc. v. HIF Bio, Inc.</u>, 129 S. Ct. 1862 (2009).

The Supreme Court decided in <u>Carlsbad</u> that a "District Court's remand order,

---

[3] We have not expressly answered this question, though some of our opinions allude to an answer.  <u>See</u> <u>New Mexico v. Gen. Elec. Co.</u>, 467 F.3d 1223, 1242 n.29 (10th Cir. 2006) (concluding that once the district court dismissed the State's federal claims in a removed case, the district court did not abuse its discretion under § 1367 in choosing to exercise supplemental jurisdiction over the remaining state law claims, without discussing § 1447(c)); <u>Hyde Park Co. v. Santa Fe City Council</u>, 226 F.3d 1207, 1209 n.1 (10th Cir. 2000) ("Federal appeals courts have consistently held . . . that they have jurisdiction to review a district court order dismissing federal claims on the merits where the district court subsequently exercised its discretion under § 1367 to remand supplemental state law claims to state court."); <u>United Int'l Holdings v. Wharf</u>, 210 F.3d 1207, 1220 (10th Cir. 2000) (explaining in the context of a non-removed case that "[o]nce federal question jurisdiction exists, it is within the trial court's discretion to exercise supplemental jurisdiction over those state law claims that derive from a common nucleus of facts.  Thus, a district court has the constitutional power to exercise supplemental jurisdiction over state claims even after a federal claim has been dismissed, provided the federal claim was not insubstantial from the outset"); <u>see</u> <u>also</u> <u>New Mexico v. Gen. Elec. Co.</u>, 335 F. Supp. 2d 1157, 1175–76 (D.N.M. 2003) (explaining that in removed cases once subject matter jurisdiction exists, § 1447(c) does not deprive a district court of the authority to hear related state law claims even if the federal claim is later dismissed and that remand of those claims within the court's supplemental jurisdiction is left to the court discretion under § 1367(c)), <u>affirmed in part and dismissed in part on other grounds</u>, 467 F.3d 1223 (10th Cir. 2006).  Other courts have decided that revised § 1447(c)'s "lacks subject matter jurisdiction" does not take into account events that occur after removal, <u>see</u> <u>Bogle v. Phillips Petroleum Co.</u>, 24 F.3d 758, 762 (5th Cir. 1994); <u>Matter of Shell Oil Co.</u>, 966 F.2d 1130, 1133 (7th Cir. 1992).  <u>Contra</u> <u>Villano ex rel. Villano v. Kohl's Dep't Stores, Inc.</u>, 362 F. Supp. 2d 418, 420 (S.D.N.Y. 2005) (deciding that § 1447(c)'s revised language means that a district court must "remand [an] action if at any time before final judgment the basis for federal jurisdiction ceases to exist, irrespective of whether removal was proper at the time it was made.")

which rested on its decision declining to exercise supplemental jurisdiction over respondents' state-law claims," was not a "remand based on 'lack of subject matter jurisdiction for purposes of § 1447(c).'" 129 S. Ct. at 1866. The Court explained that when the district court dismissed the single federal claim from the case, the district court nonetheless retained its statutory supplemental jurisdiction over the remaining state-law claims because "§§ 1367(a) and (c) provide a basis for subject-matter jurisdiction over any properly removed state claim." Id. at 1867. The district court's subsequent "decision declining to exercise that statutory authority was not based on a jurisdictional defect but on its discretionary choice not to hear the claims despite its subject-matter jurisdiction over them." Id. Thus, an appellate court reviews the district court's remand order in that situation for abuse of discretion. Id. Based on Carlsbad, we must conclude that after granting Plaintiffs' motion to dismiss their only federal claim, the district court in this case retained subject matter jurisdiction over the remaining state-law claims against BNSF and San Miguel County and, therefore, § 1447(c) did not require it to remand the state-law claims. Instead, the district court possessed the discretion to either retain or remand those claims pursuant to § 1367(c).

In exercising that discretion, the Supreme Court has instructed courts should consider "the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims." Carnegie-Mellon, 484 U.S. at 350. In this case, the

6

district court concluded that judicial economy and fairness supported retaining jurisdiction over Plaintiffs' state law claims against BNSF and San Miguel County. At the time Plaintiffs requested remand, the parties had "filed a Joint Status Report and Provisional Discovery Plan, prepared and served disclosure statements as required by [Fed.]R.Civ.P. 26(a), attended a scheduling conference, exchanged written discovery, taken multiple depositions, participated in a telephonic status conference, and designated expert witnesses. A trial date of August 10, 2009 ha[d] been set." Appx. at 103. We reverse for an abuse of discretion only "when the district court bases its ruling on an erroneous conclusion of law or relies on clearly erroneous fact findings. . . . '[W]e may not . . . substitute our own judgment for that of the trial court.'" Kiowa Indian Tribe of Okla. v. Hoover, 150 F.3d 1163, 1165 (10th Cir. 1998) (quoting Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc., 805 F.2d 351, 354–55 (10th Cir. 1986)). Because the district court did not make any erroneous conclusions of law or fact, we uphold its discretionary choice to refuse to remand this case to state court.

## II.

Next, we address Plaintiffs' challenge to the district court's exclusion of their August 2008 expert report pursuant to Fed. R. Evid. 702. "Like other evidentiary rulings, we review a district court's decision to exclude evidence at the summary judgment stage for abuse of discretion." Sports Racing Serv., Inc. v. Sports Car Club of Am., Inc., 131 F.3d 874, 894 (10th Cir. 1997). Consequently, "we will not disturb

7

the determination absent a distinct showing that it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment." Cartier v. Jackson, 59 F.3d 1046, 1048 (10th Cir. 1995). Fed. R. Evid. 702 provides for the admission of expert testimony, "if (1) the testimony is based upon sufficient facts or data." "[N]othing in either Daubert[v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993),] or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Thus, "the testimony of an expert can be rejected on summary judgment if it is conclusory and thus fails to raise a genuine issue of material fact." Matthiesen v. Bank One Mortg. Corp., 173 F.3d 1242, 1247 (10th Cir. 1999).

Plaintiffs timely submitted a sixteen-page expert report prepared by Dr. Kenneth Heathington. In conjunction with granting BNSF's motion for summary judgment, the district court granted BNSF's motion to strike this report on the basis that it contained conclusions unaccompanied by factual predicates. In his "preliminary" August 2008 report, Dr. Heathington asserted he made a personal site inspection of the railroad crossing and from that inspection he was able to obtain "a lot of data." Appx. at 200. Based upon that inspection, he notably stated:

There are severely reduced sight distances for the crossing, and there

8

appears to be sight distance restrictions even when stopped at the STOP sign. Specific sight distance deficiencies will be calculated once a plan view has been prepared by a surveyor and certain photogrammetric analyses are completed. *Once the plan view is completed, calculations can be made as to what percentage of reduction, if any, of sight distance do various areas of vegetation pose. . . .* It can be concluded at this point in time that there are very serious safety deficiencies at the crossing . . . . *Sufficient data has not been resolved at this point to state the deficiencies in hardly more than qualitative terms.*

(emphasis added). Id. at 203. Given these admitted factual deficiencies, the report otherwise contains only two sets of objective measurements—the width of the roadway and crossing—but does not indicate what those widths ideally should be or how the actual widths are dangerous. Otherwise, the report describes the crossing in qualitative or subjective terms: "very complex," "very sharp horizontal curves," "steep vertical curves," "significantly skewed," and "big hump." Without stating the facts upon which his subjective conclusions are based, Dr. Heathington's report contains nothing more than *ipse dixit*, making it nearly impossible for the trial court to evaluate his opinion pursuant to Fed. R. Evid. 702. The district court therefore did not abuse its discretion in deciding that the report lacked adequate factual support for its conclusions.

III.

We now turn to whether the district court abused its discretion in striking Plaintiffs' February 2009 "supplemental" expert report as untimely. We conclude Plaintiffs' arguments that the district court abused its discretion by striking the report with regard to BNSF are unpersuasive for reasons explained herein. But because we

9

ultimately reverse the district court's grant of summary judgment in favor of San Miguel County, we vacate the district court's decision to strike the February report with regard to San Miguel County and remand for further consideration.

Fed. R. Civ. P. 26(a)(2)(B)(i) requires the disclosure of an expert's report, which "must contain . . . a complete statement of all opinions the witness will express and the basis and reasons for them." Courts may set a time by which the parties must submit their experts' reports. Fed. R. Civ. P. 26(a)(2)(D). Parties bear a continuing obligation to supplement these reports if the parties later learn the information initially provided is incomplete or incorrect. Fed. R. Civ. P. 26(a)(2)(E) and 26(e). "Rule 26(a) expert reports . . . are intended not only to identify the expert witness, but also 'to set forth the substance of the direct examination' . . . [and are] necessary to allow the opposing party 'a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.'" Jacobsen v. Deseret Book Co., 287 F.3d 936, 953 (10th Cir. 2002) (quoting Fed.R.Civ.P. 26(a)(2) advisory committee note (1993)). "[A] district court can allow evidence violating Rule 26(a) only if the violation was justified or harmless." Id. (citing Fed. R. Civ. P. 37(c)). But, "[a] district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure." Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170 F.3d 985, 993 (10th Cir. 1999). In making this determination, the following factors guide the broad discretion of district courts: "(1) the prejudice or surprise to

10

the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." Id.

The district court ordered Plaintiffs to submit their expert reports pursuant to Fed. R. Civ. P. 26(a)(2)(B) by August 29, 2008. Appx. at 870. The court also set discovery and dispositive motion deadlines which were "extended by the agreement of the parties to February 28, 2009 and March 27, 2009, respectively." Id. at 871. The case was set for trial in August 2009. Id. at 103. Accordingly, Plaintiffs submitted the sixteen-page report prepared by Dr. Heathington, discussed in Part II, on August 29, 2008 in which he lists numerous materials he will need to consult to complete his analysis, *i.e.*, the calculation of "what percentage of reduction, if any, of sight distance do various areas of vegetation pose," and indicating that "this preliminary report will be significantly expanded as information that has been requested is received. I do not expect these preliminary findings to change but only to be significantly expanded upon." Id. at 203, 205. BNSF tried to depose Dr. Heathington during the discovery period, but Plaintiffs stated that they and Dr. Heathington were unavailable and, in any case, BNSF would want to wait to depose him until it received his "supplemental" report which they anticipated he would complete in mid-February. Id. at 803. BNSF thereafter selected its experts and timely submitted their reports to Plaintiffs. On February 20, 2009 Plaintiffs provided Dr. Heathington's 197-page "supplemental" report. That same day, BNSF filed its

11

motion for summary judgment. Thus, the supplemental report "was received eight days before the discovery deadline, six months after the Rule 26 deadline, and on the same date that BNSF moved for summary judgment" and just more than one month before all dispositive motions were due. Id. at 871–72. Less than a week later, BNSF filed a motion to strike the February 2009 supplemental report (as well as Dr. Heathington's August 2008 preliminary report).

Plaintiffs listed thirteen items that Dr. Heathington claimed were necessary to his analysis which were unavailable prior to the August 2008 Rule 26 deadline. Id. at 872. But, the district court noted that between the time Plaintiffs retained Dr. Heathington in May 2008 and the expert report deadline in August 2008, Plaintiffs evidently made very little effort to obtain the necessary information:

> For example, it was up to the *Plaintiffs* to perform the survey, do a site inspection, take photographs of Galen's car (which was in Plaintiffs' possession), conduct interviews with the local residents, and perform the photogrammetric analysis. Plaintiffs made no request to go on the subject property until June 25 and then never followed up. The train volumes and traffic volumes were never requested. The depositions were not noticed until September, 2008, which was *after* the report deadline.

Id. at 873. And, the rest of the "unavailable" information BNSF in fact provided to Plaintiffs in its initial disclosures. Id. Plaintiffs did not provide an explanation as to why they did not seek or provide any of this information to Dr. Heathington in a timely manner. Id. at 874.

Taking into consideration the factors we laid out in Jacobsen, the district court

12

granted BNSF's motion to strike, explaining:

> Because the Supplement[al Report] was submitted on the same day as BNSF filed its Motion for Summary Judgment, the prejudice and surprise are apparent. There is no ability to cure this prejudice at the summary judgment stage. . . . Plaintiffs provide the Court with no explanation as to why the allegedly necessary information was not sought in a timely manner. Nor do they explain why the information they did have was not provided to Dr. Heathington.

Id. According to the court, admitting the report at this stage in the litigation:

> Would necessitate an entire re-working of the case. Dr. Heathington's reliance on several different analytic approaches . . . as well as his reliance on many and varied studies on train safety would either dramatically expand the already retained experts' opinions or would require new experts to be employed. New reports would be generated. Discovery would be reopened and new trial deadlines would be set due to scheduling conflicts. Although enough time and money can cure almost any deficiency, the Court does not believe that perpetual litigation is what the Tenth Circuit . . . meant by "cure."

Id. at n.3. Plaintiffs also never requested an extension of the Rule 26 deadline. For these reasons, the court concluded Plaintiffs had displayed a "complete lack of diligence" and "utter lack of regard to the deadlines." Id. The court, as result, determined the Rule 26 violation "was neither justified nor harmless." Id.[4]

---

[4] We acknowledge the district court did not explicitly declare Plaintiffs' conduct to have been in bad faith or wilful (though it comes close by describing their unexplained "utter lack of regard to the deadlines" when "they knew they did not have the information necessary for Dr. Heathington to complete his report and yet they did not seek an extension of time."). Id. Regardless, as we have previously explained, Plaintiffs' "good faith alone would not be enough to overcome the other factors" and "'a district court need not make explicit findings concerning the existence of a substantial justification or harmlessness.'" Jacobsen, 287 F.3d at 953, 954 (quoting Woodworker's Supply, 170 F.3d at 993)).

13

On appeal, Plaintiffs contend BNSF waived its objections to Dr. Heathington's supplemental report because BNSF was aware of the disclosed deficiencies in his August 2008 preliminary report and the level of detail that Dr. Heathington would later provide as a result of his having testified in dozens of cases against BNSF. Plaintiffs also argue they sent a letter to BNSF's counsel asking if BNSF had any objection to Dr. Heathington taking additional time to supplement his preliminary report. According to Plaintiffs, BNSF made no objection. Plaintiffs additionally contend submitting this 197-page report six months after the court's expert disclosure deadline does not in any way prejudice BNSF because time remains to depose Dr. Heathington and to provide rebuttal testimony prior to trial.

First, Plaintiffs provide no authority for the assertion that a party can waive objections to another's compliance with court-ordered deadlines by virtue of its conduct in another case. Second, it appears BNSF did alert Plaintiffs to its belief that Dr. Heathington's "preliminary" August report was incomplete because it "lack[ed] opinions whatsoever, much less the information mandated by Fed. R. Civ. P. 26(a)(2)." Appx. at 80. Moreover, whether BNSF objected to Plaintiffs' August 2008 expert report for any reason strikes us as entirely irrelevant to the merits of BNSF's objection that Plaintiffs submitted the February 2009 report six months after the court-imposed expert disclosure deadline. Third, as the district court noted, if Plaintiffs needed additional time, they should have requested an extension from the court, not solely from BNSF. See Sims v. Great Am. Life Ins. Co., 469 F.3d 870,

14

895 (10th Cir. 2006) ("Despite ample opportunity to request an amendment to the scheduling order, Great American never did so, instead opting to file an Amended Witness List . . . five months past the original deadline. Because Great American did not comply with the court's scheduling order, the district court properly excluded Great American's accident reconstruction expert as untimely disclosed."). Finally, the district court rationally concluded that a "supplemental" report that adds approximately 180 pages of additional information to a sixteen page report "eight days before the discovery deadline, six months after the Rule 26 deadline, and on the same date that BNSF moved for summary judgment" and just more than one month before all dispositive motions were due would prejudice BNSF and disrupt the litigation. Appx. at 871–72, 874 n.3. For these reasons, we uphold the district court's decision to strike the report as to BNSF.

However, the analysis as to San Miguel County substantially differs. The County did not move to strike the February report because "it believed (1) . . . San Miguel had been placed on sufficient notice of Dr. Heathington's opinions regarding San Miguel in his initial report; and (2) Dr. Heathington's supplemental report actually lent support to San Miguel's defense." San Miguel Resp. Br. at 3. Regardless, the district court refused to consider the February report in granting the County's motion for summary judgment. Appx. at 1162–63 n.2. ("As detailed in this Court's earlier Memorandum Opinion and Order [Doc. 124], Dr. Heathington's Supplemental Report was stricken from the record. Despite that, the County attaches

15

a page from the [report] . . . .  The Court will not consider that Report.").  The new trial schedule necessitated by this appeal's outcome combined with the County's repeated belief that the February report's untimely submission was harmless significantly alter the Jacobsen calculus.  Trial is no longer imminent because we are remanding this case for further proceedings.  Upon remand, the district court could allow more time for discovery without disrupting the trial schedule.  Jacobsen, 287 F.3d at 954.  Or, it could find that the Rule 26(a) violation remains neither justified nor harmless.  But given the change in circumstances this opinion works, we leave that determination for the district court.

IV.

To the merits, we go.  In their wrongful death suit, Plaintiffs allege BNSF negligently designed and maintained the crossing, by failing to clear excessive vegetation from the sight triangle, install active warning devices (*e.g.*, flashing lights, wig-wags, bells, and/or gates to warn of approaching trains), and take other reasonable steps to make its crossing reasonably safe for the traveling public.  See Aplt. Open. Br. at 4.  It is undisputed that BNSF marked the crossing with a stop sign and a railroad crossing symbol (though not an official, reflectorized crossbuck sign) approximately twelve to fourteen feet from the tracks.  It is also undisputed that Galen's car was on the tracks when the train collided with the vehicle.  The parties dispute, however, whether Galen stopped at the stop sign.  After striking both of Plaintiffs' expert reports, the district court granted BNSF's motion for summary

16

judgment. In its view, Plaintiffs had failed to demonstrate a genuine issue of fact as to whether "BNSF breached any duty of care it may have had to Galen or that any breach on its part led to the collision." Id. at 877.

## A.

"We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court." Garrison v. Gambro, Inc., 428 F.3d 933, 935 (10th Cir. 2005) (internal quotations omitted). Summary judgment is appropriate only when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). When reviewing the evidence, we draw all reasonable inferences therefrom in the light most favorable to Plaintiffs. Garrison, 428 F.3d at 935.

## B.

Under New Mexico law, Plaintiffs bear the burden of proving their negligence allegations by demonstrating "the existence of a duty" owed by Defendants to them, "breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of" their damages. Chavez v. Desert Eagle Distrib. Co. of N.M., 151 P.3d 77, 80 (N.M. Ct. App. 2006) (internal quotations omitted). "'Negligence is generally a question of fact for the jury. A finding of negligence, however, is dependent upon the existence of a duty on the part of the defendant. Whether a duty exists is a question of law for the courts to decide.'" Herrera v. Quality Pontiac, 73 P.3d 181, 186 (N.M. 2003) (quoting Schear

17

v. Bd. of Cnty. Comm'rs, 687 P.2d 728, 729 (N.M. 1984)). Whether a defendant breached that duty and whether that breach constitutes a proximate cause of the plaintiff's injury are questions of fact. Id. But, we may "decide questions of negligence and proximate cause, if no facts are presented that could allow a reasonable jury to find proximate cause." Calkins v. Cox Estates, 792 P.2d 36, 42 n.6 (N.M. 1990).

New Mexico law requires "a railroad . . . to exercise the standard of care of a reasonably prudent person." Lopez v. S. Pac. Co., 499 F.2d 767, 774 (10th Cir. 1974); see also Largo v. Atchison, Topeka & Santa Fe Ry. Co., 41 P.3d 347, 352 (N.M. App. 2001) (explaining that railroads have a duty "'to take all reasonable precautions to maintain grade crossing safety'" (quoting CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 665 n.5 (1993))); Lerma v. State Highway Dep't of N.M., 877 P.2d 1085, 1087 (N.M. 1994) (concluding that every person has a duty to exercise ordinary care for others' safety). Therefore, "railroads have a common-law duty to provide and adequately maintain warnings at railroad crossings." Largo, 41 P.3d at 351. New Mexico courts have also held railroads responsible for vegetation that obstructs the view of the track along the line of approach. See De Padilla v. Atchison, T & S.F. Ry. Co., 120 P. 724, 729–30 (N.M. 1911) (upholding a verdict against the railroad despite allegations of the deceased's negligence in crossing the tracks in part because "there is also evidence in the record . . . tending to establish the fact that at other points along the line of [the deceased's] approach to the track

18

his view was obstructed by trees, weeds, and an irrigation ditch"). "[W]hether reasonable care and prudence require under all the circumstances of [a] case that special warning facilities be maintained at a crossing is a question of fact for the jury." Lopez, 499 F.2d at 774; see also Herrera, 73 P.3d at 195 ("The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case.").

New Mexico law also requires "a traveler approaching an open, unguarded railroad crossing . . . to stop, look and listen for trains using the tracks, and the act of looking and listening must be performed in such [a] manner as to make it reasonably effective." Chicago, Rock Island & Pac. R.R. Co. v. McFarlin, 336 F.2d 1, 2 (10th Cir. 1964). However, New Mexico law provides:

> "A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred. It need not be the only cause, nor the last nor nearest cause. It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury."

Herrera, 73 P.3d at 195 (quoting U.J.I. 13-305 NMRA 2003) (alteration in Herrera). As a result, a driver's failure to "stop, look and listen" will not necessarily be deemed as a matter of law the sole proximate cause of the collision if sufficient evidence exists from a which a jury could conclude the railroad was also negligent.

19

Lopez, 499 F.2d at 771. Nor will a motorist's failure to "stop, look and listen" preclude recovery under a theory of contributory negligence because New Mexico has adopted comparative fault. See Tafoya v. Rael, 193 P.3d 551, 556 (N.M. 2008) (explaining that under New Mexico's comparative fault regime "although [a defendant] may have owed a duty to Decedent, [the defendant] can only be liable for that portion of damages attributable to his own negligence, and his liability will be reduced in proportion to Decedent's own . . . negligence in the event that caused his death.").[5] Like proximate cause, comparative fault is a question of fact. Lerma, 877

---

[5] In Lopez, the district court directed a verdict in favor of the railroad with respect to the decedent driver because he "failed to stop at a stop sign, which constituted contributory negligence as a matter of [New Mexico] law." 499 F.2d at 771. That ruling was not appealed. With regard to the decedent passengers, however, we could not "say as a matter of law that [the driver]'s running of the stop sign was the sole proximate cause of the accident" because "[i]n New Mexico there may be more than one proximate cause and based upon the evidence [of the railroad's negligence] the jury could reasonably determine that [the railroad]'s negligence was one of the proximate causes." Id. In McFarlin, we decided that the plaintiff was guilty of contributory negligence under New Mexico law for failing to stop, look, and listen for a train at a point along the road from which she could see the tracks. 336 F.2d at 3. But we decided Lopez and McFarlin when New Mexico still employed contributory negligence. In 1981, the New Mexico Supreme Court discarded contributory negligence and adopted comparative fault so that a plaintiff's own negligence no longer precludes her recovery entirely against a tortfeasor. Tafoya, 193 P.3d at 556 (citing Scott v. Rizzo, 634 P.2d 1234, 1241–42 (1981) ("hold[ing] that a pure comparative negligence standard shall supersede prior law in New Mexico, and that a plaintiff suing in negligence shall no longer be totally barred from recovery because of his contributory negligence."), overruled on other grounds by Herrera, 73 P.3d 181). To be sure, New Mexico law continues to impose a duty upon drivers to stop, look, and listen before crossing railroad tracks. Scott and its progeny mean, however, that a driver's negligent breach of that duty no longer entirely bars his own recovery from the railroad.

20

F.2d at 1088. Therefore, at this stage in the litigation we must decide whether any genuine issues of fact exist as to whether BNSF breached its duty of reasonable care in designing, constructing, or maintaining the crossing at issue and whether that breach was *a* proximate cause of Galen's collision.

C.

Plaintiffs fail to clear the first hurdle of providing evidence that raises genuine issues of material fact as to BNSF's breach. Aside from Dr. Heathington's excluded reports, Plaintiffs attached to their response to BNSF's motion for summary judgment the testimony of Harold Garcia, a San Miguel County representative, who stated "the fence line . . . is what signifies the railroad right-of-way" and the end of the county's ownership of the road that crosses the track. Appx. at 365–66. They attached portions of the deposition of David Rivera, a BNSF representative, who testified that BNSF policy dictated "vegetation shall be controlled for the full width of the railroad's right-of-way at the crossing," he could not recall any vegetation within BNSF's right-of-way that obstructs the view of an oncoming train, and that approximately two trains a day pass through the crossing in addition to the occasional empty freight train. Id. at 429, 438, and 443. Plaintiffs submitted the testimony of the train's engineer which described the accident in rather unfavorable terms from Plaintiffs' perspective. They also provided the deposition of the train's co-engineer in which he stated that he thought there were bushes and trees along the fence line and that he could not see an approaching car because of that vegetation

21

until the car made the turn toward the tracks and passed the fence line. Id. at 393.

Plaintiffs additionally provided the testimony of Galen's mother which described

Galen's good driving habits, her personal experience in crossing the tracks, and

acquaintances' close calls in crossing the tracks about which she had heard. Lastly,

Plaintiffs attached a single photograph of the stop and railroad crossing sign posted

by BNSF at the crossing. Id. at 444.[6]

---

[6] In their opening brief before this Court, Plaintiffs cite photographs and a video they argue shows the dirt and gravel road that crosses the track and is lined on both sides with intermittent vegetation outside of BNSF's right-of-way. Aplt. Open. Br. at 11–12; Appx. at 985–1002. Plaintiffs also cite pictures which they argue depict some vegetation along and extending within the fence line that parallels the track as well as down the tracks. And, they point to the affidavits of local residents who described their inability to see the tracks until just before crossing them. Id. at 1014–31. However, they first presented this evidence to the district court after it had entered summary judgment for BNSF in their response to *San Miguel County's* motion for summary judgment and called them to the court's attention in their unsuccessful motion for reconsideration of the district court's grant of BNSF's motion for summary judgment. Though we review the grant of summary judgment de novo, generally "our inquiry is limited to the summary judgment record before the district court when the motion was decided." West Coast Life Ins. Co. v. Hoar, 558 F.3d 1151, 1157 (10th Cir. 2009) (internal quotations omitted). We also "ordinarily limit[] our review to the materials adequately brought to the attention of the district court by the parties." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998). Thus, we are not at liberty to consider that evidence on appeal of the grant of summary judgment to BNSF.

We acknowledge Plaintiffs subsequently submitted this evidence and called it to the court's attention in Plaintiffs' motion for reconsideration. But such an acknowledgment provides Plaintiffs little relief. First, Plaintiffs would bear the considerable burden of demonstrating the court's denial of reconsideration constituted an abuse of discretion. Fye v. Okla. Corp., Comm'n, 516 F.3d 1217, 1223–24 (10th Cir. 2008); Artes-Roy v. City of Aspen, 31 F.3d 958, 961 n.4 (10th Cir. 1994) (refusing to consider evidence first presented to the district court with the plaintiff's motion to reconsider "because plaintiff cannot get a second chance to

(continued...)

22

None of this evidence suggests that BNSF breached its duty in designing or constructing the crossing because it does not describe in more than general terms the crossing's configuration, construction, design, or elevation. As to the adequacy of the warnings, the sole picture Plaintiffs attached reveals the crossing was marked with a stop sign and a railroad crossing sign and that the sign was unobstructed. Besides Dr. Heathington's reports, Plaintiffs have not provided any evidence as to how that warning was insufficient. The evidence remaining in the record comes the closest to suggesting the existence of some sort of vegetation obstruction within BNSF's right-of-way. But ultimately it fails to raise a genuine issue of fact as to whether any vegetation grew within BNSF's right-of-way that obstructed a motorist's view of an oncoming train.

V.

Finally, we turn to Plaintiffs' appeal of the grant of summary judgment to San Miguel County. "For purposes of its motion for summary judgment and this appeal only, San Miguel admits it[] had a duty to maintain a safe roadway and that it

---

[6](...continued)
present the facts on a motion to reconsider"). Second, and most important, though Plaintiffs' notice of appeal indicates they challenge the district court's denial of reconsideration, they have failed to argue on appeal it abused its discretion in denying their motion for reconsideration. Instead, they choose to focus solely on the court's order granting summary judgment in favor BNSF. Thus, whether the district court should have reviewed the evidence Plaintiffs provided subsequent to its summary judgment order is not properly before us. See Jordan v. Bowen, 808 F.2d 733, 736 (10th Cir. 1987) ("Appellants who fail to argue the issue in their brief are deemed to have waived their contention on appeal.").

breached that duty when it failed to (1) remove vegetation on the approach to the crossing; (2) improve [the road] to provide a stable, level and sufficiently-wide driving surface; (3) change the configuration of [the road] so the approach to the crossing did not involve multiple turns and slopes requiring driver attention; and (4) erect an advance warning sign on [the road]." San Miguel Resp. Br. at 9. Regardless of these breaches, the County argues that because Galen had a duty to stop at the stop sign and no sight obstructions appear at the stop sign, Galen by virtue of his fault alone either (1) stopped at the sign but misjudged the train's speed in proceeding through the crossing or (2) failed to stop at the sign altogether. Id. at 10. San Miguel argues that as a result "Plaintiffs presented no facts which would allow a reasonable jury to find its negligence proximately caused Galen Stoller's death." Id. at 9.

The district court entered summary judgment for San Miguel, explaining:

> In this case, Galen had the duty of ordinary care, which was to stop, look, and listen at the railway crossing and then to proceed through the crossing only if it was safe to do so. The undisputed facts indicate that the crossing in question was marked as a railroad crossing; Galen was familiar with the crossing; there was a stop sign at the crossing; Galen had been instructed by his Mother to stop at the stop sign; the train sounded its whistle prior to arriving at the crossing; and Galen's car was on the railroad tracks when the train collided with the vehicle.

Appx. at 1164. We take no issue with those findings. The district court went on to conclude:

> There is simply no evidence in this case that the County breached any duty to Galen which was the proximate cause of his death. . . . [E]ven

24

> if there was sight impairment at 50 feet from the crossing, there is no evidence that there was sight impairment at the stop sign, which was 12 feet from the crossing and where every motorist has the duty to stop, look, and listen and proceed only when safe to do so. The lack of evidence of any negligence on the part of the County

entitles it to summary judgment. Id. at 1165.

Notably, however, San Miguel County has *admitted* its negligence. It only disputes whether that negligence was a proximate cause of the collision. Therefore, we need not decide whether Plaintiffs have presented a genuine issue of fact as to whether San Miguel breached any duty it owed Galen. Instead, we must determine if a genuine issue of fact exists as to whether San Miguel's admitted negligence was *a* proximate cause of the collision and whether Galen's conduct constitutes an intervening cause.

San Miguel acknowledges that under New Mexico law there may be more than one proximate cause of an injury and that the issues of proximate and intervening cause turn on foreseeability. Nonetheless, San Miguel contends that Galen's failure to stop at the stop sign or misjudgment of the train's speed were unforeseeable. We note, however, that whether Galen failed to stop and or negligently misjudged the train's speed is genuinely disputed. Regardless, San Miguel's assumption that it breached the duties it owed Galen means that we cannot hold as a matter of law that Galen's alleged failure to stop at the stop sign was the sole proximate cause of the accident. See Lopez, 499 F.2d at 771.

Moreover, we cannot say at this stage in the litigation that as a matter of law

25

Galen's alleged negligence was an intervening cause. Two cases convince us this is so. In Lopez, the decedent motorist failed to stop at a nearby stop sign before traversing the railroad crossing. Nonetheless, the jury entered a verdict in favor of the passengers' estates. 499 F.2d at 772. The railroad appealed the verdict, arguing the trial court erred in refusing to give an intervening cause instruction. Id. "The evidence showed that [the railroad] knew a high percentage of motorists failed to stop at their railroad crossings." Id. The evidence at trial also "suggested these passive devices [stop signs and crossbucks] did not sufficiently warn motorists, who were negotiating sharp curves and looking for traffic at intersections, that a train was approaching." Id. at 771. And, the railroad produced no evidence that the motorist's failure to stop produced a result that could not be reasonably foreseen to be a result of the railroad's failure to provide adequate warning devices. Id. at 772. We therefore concluded the trial court did not err in refusing to give an intervening cause instruction. Id. Notably, Lopez did not interpret New Mexico law to require the plaintiffs to prove the railroad's negligence caused the decedent to run the stop sign. Lopez, instead, asked whether running a stop sign was a foreseeable result of the railroad's alleged negligence. Finding that it was, Lopez concluded the railroad was not entitled to an intervening cause instruction and let the jury's determination of proximate cause stand.

In Lerma v. State Highway Department of New Mexico, 877 P.2d 1085 (N.M. 1994), a thirteen-year-old was hit by a car after climbing over a fence along a

26

freeway. The State Highway Department maintained in the subsequent personal injury action that as a matter of law the child's "intentional act of crossing the interstate was the sole proximate cause of her injuries." 877 P.2d at 1086. The trial court granted summary judgment in favor of the Department, and the court of appeals reversed. Id. at 1085. In concluding that genuine issues of material fact as to proximate cause and comparative negligence existed, the New Mexico Supreme Court explained "'some degree of negligence on the part of all persons is foreseeable'" and "[t]he fact that the danger may have been open and obvious would not obviate a duty on the part of the Department to protect the public from the public's own foreseeable negligence." Id. at 1088 (quoting Klopp v. Wackenhut Corp., 824 P.2d 293, 297 (N.M. 1992)). Therefore, the Court refused to hold as a matter of law that the child's own conduct was the sole proximate cause of the accident.

Although San Miguel County has not admitted it knew people regularly failed to stop at railroad crossings or stop signs, running a stop sign or misjudging a train's speed seems at least as foreseeable as climbing over a four foot fence to cross a freeway. And, the County has not provided any reason to conclude Galen's alleged failure to stop or inability to judge the speed of the train could not be reasonably foreseen as a result of its admitted failure to "(1) remove vegetation on the approach to the crossing; (2) improve [the road] to provide a stable, level and sufficiently-wide driving surface; (3) change the configuration of [the road] so the approach to the

27

crossing did not involve multiple turns and slopes requiring driver attention; and (4) erect an advance warning sign on [the road]." San Miguel Resp. Br. at 9. One of the reasons someone may not stop before crossing railroad tracks or at a stop sign, though he has the duty to do so, is that he does not perceive any danger because he cannot see the approaching train before he gets to the stop sign or tracks as a result of sight obstructions caused by vegetation or turns and slopes in the road. Therefore, we cannot say as a matter of New Mexico law that Galen's alleged negligence in failing to stop at the stop sign or misjudging the speed of the train after stopping is so far removed from San Miguel's admitted negligence that his conduct constitutes an intervening cause, breaking the proximate cause chain. We leave the ultimate resolution of that question for the trier of fact.

For these reasons, we uphold the district court's exclusion of Plaintiffs' August expert report, uphold its exclusion of Plaintiffs' February expert report as to BNSF, vacate its exclusion of Plaintiffs' February expert report as to San Miguel County, AFFIRM its entry of summary judgment in favor of BNSF, REVERSE its entry of summary judgment in favor of San Miguel County, and remand for further proceedings.

Entered for the Court,


Bobby R. Baldock
United States Circuit Judge

28