**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 6, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MAIDA HENDERSON, and KEN
STOLLER, M.D., as Co-Personal
Representatives of the Estate of
GALEN STOLLER, a minor child, and
MAIDA HENDERSON, as mother of
GALEN STOLLER, deceased,

     Plaintiffs - Appellants,

v.

BOARD OF COUNTY
COMMISSIONERS FOR SAN
MIGUEL COUNTY and SAN
MIGUEL COUNTY,

     Defendants - Appellees.

No. 12-2057
(D. New Mexico)
(D.C. No. 2:08-CV-00298-KBM-RHS)

---

**ORDER AND JUDGMENT**[*]

---

Before **LUCERO**, **HOLLOWAY**, and **HARTZ**, Circuit Judges.

---

Plaintiffs Maida Henderson and Dr. Ken Stoller sued San Miguel County

---

[*]After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent except under the doctrines of law of the case, res judicata, and
collateral estoppel. It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

and the San Miguel County Board of County Commissioners (collectively, the County), among other parties, for wrongful death after an Amtrak passenger train struck and killed their son in his car at a railroad crossing in New Mexico.[1] The County, the final remaining Defendant, moved for summary judgment, and the district court granted the motion. Plaintiffs appeal, invoking this court's jurisdiction under 28 U.S.C. § 1291.

## I

Plaintiffs' son, Galen Stoller, was sixteen when he died in December 2007. The accident occurred near his home on a road that he regularly used. That road is referred to in the record by several names, including Wildflower Lane, which we will use in this opinion. Wildflower Lane, at least the relevant portion of it, was a dirt road which ran parallel to the BNSF railroad tracks for some distance before making a 90-degree turn toward the tracks about 200 feet before the crossing. The railroad's right-of-way extends about 50 feet from the crossing. Inside the right-of-way, BNSF had installed a stop sign; on the same pole as the

---

[1] Plaintiffs originally sued in state court. The original Defendants included Amtrak, and the Defendants removed the case to federal district court under 28 U.S.C. § 1349, on the factual basis that the United States owned more than 50% of Amtrak's stock. In a previous appeal, this court affirmed the district court's summary judgment in favor of the Burlington Northern Santa Fe Corporation, the railroad known as BNSF, over whose tracks the train had been running. *See Henderson v. National Railroad Passenger Corp.*, 412 Fed. Appx. 74 (10th Cir. 2011). We also affirmed the district court's decision to retain jurisdiction under 28 U.S.C. § 1367(a) after Plaintiffs had voluntarily dismissed their claims against Amtrak.

stop sign, the railroad had attached an X-shaped sign that indicated the presence of a railroad crossing. From the photograph of this sign in the record, it appears to be much smaller than the traditional X-shaped railroad crossing sign. The stop sign on the side of the crossing from which Galen Stoller was approaching was only 12 feet from the near rail. The train that struck Stoller's vehicle was traveling at approximately 62 m.p.h. Speeds up to 79 m.p.h. are permitted on that stretch of track.

**II**

**A**

"We review a grant of summary judgment *de novo*, applying the same standard as the district court." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998). Under Fed. R. Civ. P. 56(a), summary judgment should be entered by the district court if "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." On appeal,

> [w]e examine the record to determine whether any genuine issue of material fact was in dispute; if not, we determine whether the substantive law was applied correctly, and in so doing we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion.

*McKnight*, 149 F.3d at 1128 (brackets and quotations omitted). Because Plaintiffs' negligence claims are pendent state-law claims, we apply the substantive law of the forum state, New Mexico. *See Lytle v. City of Haysville*,

138 F.3d 857, 868 (10th Cir. 1998). "We follow federal law, however, regarding the standard for granting summary judgment." *Brown v. Sears, Roebuck & Co.*, 328 F.3d 1274, 1278 (10th Cir. 2003).

**B**

A negligence claim under New Mexico law generally requires "the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages." *Herrera v. Quality Pontiac*, 73 P.3d 181, 185–86 (N.M. 2003). On appeal, as in the district court, Plaintiffs have alleged that the County breached its duty of care in the following respects: (1) failing to place signs along the roadway that would warn motorists of the railroad crossing ahead; (2) failing to clear vegetation between the railroad tracks and the road that prevented a motorist at the crossing from seeing oncoming trains; (3) failing to ensure that the road was appropriately wide, level, and stable so that motorists could focus on the upcoming crossing rather than on negotiating the road itself; and (4) otherwise failing to take reasonable steps to make the crossing safe. We recognize that these theories of negligence may be interrelated so that one alleged defect could require greater care in responding to another.[2]

---

[2]Accordingly, the discussion which follows on the sufficiency of certain

(continued...)

We focus on Plaintiffs' first two allegations of negligence. These allegations are based on simple, common-sense propositions: that the crossing would have been made less dangerous if the County had placed an additional sign or signs to warn approaching motorists of the hazardous crossing,[3] and if the County had cleared vegetation from the approach to the track so that motorists had a clearer view of on-coming trains. Hence we will provide an overview of Plaintiffs' evidence on these points.

*First*, as to the dangerousness of the crossing in general, as already noted one of the engineers in charge of the train at the time of the fatal accident revealed that he had experienced other "close calls" at this crossing. Several residents swore in deposition or in affidavits that they had direct experience with the hazardous situation from the point-of-view of drivers. Plaintiff's mother testified that, because of the speed of the trains "they seemed to get there very

[2](...continued)
evidence adduced by Plaintiffs does not imply that other evidence should be disregarded on remand. There is no need to discuss all of Plaintiffs' evidence once it is shown that the district court erred in granting summary judgment to the County.

[3]In the previous appeal, we noted that BNSF had produced evidence tending to show that Galen Stoller had failed to obey the stop sign. In the posture of the case at that time, the County had conceded negligence in order to move for summary judgment on the issue of causation. This court held that even if a jury were to find that Stoller had failed to obey the stop sign, the jury could also find that this failure was not the sole cause of the accident. In this appeal, of course, the question is whether a jury could find that the County was negligent. It is law of the case that if the County was negligent, a jury could find that negligence to have been a proximate cause of the accident.

quickly. I mean, it was always sort of a sudden, oh, there's a train kind of thing." She added that "It seemed unexpected. They would sort of appear." Aplt. Appx. at 141. Resident John Kinsolving stated: "I have always been concerned with the crossing at Wildflower Lane and County Frontage Road [where the instant tragedy occurred] and have been shocked on several occasions when I was crossing the tracks having barely being [sic] missed when the train did not blow its horn." *Id*. at 225.

Shelley Oram stated that she had lived in the area for over twelve years and on "numerous occasions" had been "surprised to find a fast moving train right before me that I could neither see nor hear until I was nearly at the track. On both sides of this crossing there are blind curves that make it impossible to see a train coming from either direction." She further swore that there had been "many occasions when I have not heard the train sound its horn until it had already passed the crossing." *Id*. at 228.

Another resident, Diane Sarris, said that it was even difficult to see the trains at this crossing from the stop sign, which is on the railroad's right-of-way about twelve feet from the tracks: "In the approach of the track, I have stopped at the railway crossing and as I started to cross the tracks, there appeared a train that I had not seen at my first visual of looking both ways. It appeared that train blended with the colors of the background in the area." *Id*. at 237. Former resident Cynthia Karrick, similarly stated that visibility was very bad at the

crossing: "Safety at this crossing is concerning due to not being able to clearly see oncoming trains or hearing [sic] the train blow its horn." She further said that once, after having stopped at the stop sign at the crossing, "I did not hear the train blow its horn and before proceeding I was shocked to see the train appear in front of me. It appears that trains blend with the different colors of the surrounding foliage in the area." *Id.* at 249.

*Second*, the Plaintiffs provided evidence that vegetation obscured a driver's view of the crossing when approaching along the County's road. Plaintiffs cite two significant items. Mr. Clayton Onnen, one of the two engineers in control of the train at the time of the accident, testified in his deposition that vehicles approaching the crossing could not be seen from the train until they emerged from the bushes and trees along the fence line. The fence line, other evidence showed, is on the boundary of the railroad right-of-way. In follow-up questioning, the engineer said that a vehicle could not be seen until it came "out of the curve and into the right-of-way."[4] Mr. Onnen also testified that he could recall "a couple of times" when he had "close calls" at this crossing. Aplt. Appx. 136-37. In the posture of this case we are duty-bound to draw the obvious inference that when vehicles are out of sight from the train, the train is also out of sight for drivers of those vehicles.

---

[4]We noted this evidence in deciding the prior appeal. *See Henderson v. Nat'l R.R. Passenger Corp.*, 412 Fed. Appx. 74, 86 (10th Cir. 2011).

Plaintiffs also cite at page 10 of their Opening Brief the report of defense expert Brian Charles, who stated: "There are trees and bushes located *outside* the right of way fence that are left and right of the road. The bushes and trees obstruct the view of the train approach when the Stoller vehicle is *outside* the fence line." *Id*. at 311 (emphasis added). This of course is consistent with the deposition testimony of the train's engineer, Mr. Onnen, which a jury would be free to credit. If there is any ambiguity in this evidence, we must of course take it in the light most favorable to Plaintiffs because we are reviewing a grant of summary judgment.

The record evidence is not specific as to the location of foliage obstructing a motorist's view of approaching trains. We have noted, however, that there is evidence from which a jury could decide that foliage outside the railroad's right-of-way creates or contributes to the problem. The state of this evidence is not fatal at the summary judgment stage for two reasons. First, it is a reasonable inference from Plaintiffs' evidence that at least some of the visual obstruction is created by foliage within the County's right-of-way. The County admittedly had done nothing to improve visibility along Wildflower Lane. It would be quite illogical – and quite contrary to our standard of review of summary judgment decisions – to assume that the growth stopped on its own upon reaching the County's right-of-way. Second, and more importantly, even if at trial it were shown that none of the vision-obscuring vegetation was within the County's right-

of-way, a jury could still determine that the County's road was unreasonably dangerous for failure to provide adequate warning of this hazard lying just across the line delineating the limit of the County's ownership of the road.

Thus Plaintiffs' evidence was clearly sufficient for a jury to determine that the crossing was unreasonably dangerous.

## C

Plaintiffs' also provide legal support for submitting this case to a jury. As we have noted, New Mexico law requires a plaintiff seeking to recover under a negligence theory to show "the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages." *Herrera v. Quality Pontiac*, 73 P.3d 181, 185-86 (N.M. 2003). The existence of a duty is not challenged here: a representative of the County testified that the County has a duty to maintain its roads in a safe condition, and the County does not contend otherwise in this appeal.

As for the standard of care, the County contends that Plaintiffs had no evidence to guide the jury in determining the "necessary standards." The County argues that the duty of reasonable care that is applicable to ordinary negligence cases is either inapplicable here or else requires elucidation from an expert witness to be rendered meaningful for a jury. In response to Plaintiffs' invocation of the common-law standard of reasonable care, the County concedes that it was

subject to this duty, yet contends that without expert testimony, "this 'reasonable duty' is only guesswork by the jury." Aple. Brief at 25.

A jury is quite capable of determining whether the County's inaction was reasonable under the common law standard. *See Henderson v. National R.R. Passenger Corp*, 412 Fed. Appx. at 85 ("The *finder of fact* must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case.") (emphasis added) (quoting *Herrera v. Quality Pontiac*, 73 P.3d 181, 195 (N.M. 2003)).

Further support for Plaintiffs' contention that expert testimony is not required here is provided by *Cumming v. Nielson's, Inc.*, 769 P.2d 732 (N.M. App. 1988). In that case an injured motorist had sued, *inter alia*, the contractor which had been performing construction work at the site of the accident. The state appellate court held that expert testimony was not required in that case to elucidate the defendant contractor's duty of care. The court went on to say that although "*expert testimony* may be useful, we hold that, absent special circumstances not present here, it *generally is not required.*" 769 P.2d at 735 (emphasis added). The context of *Cumming* is not analytically different from the instant case. Here, as in *Cumming*, expert testimony could be useful to focus on what the general standard of reasonable care means in the particular

-10-

circumstances, but it is not a necessity.

Plaintiffs' evidence showed that the crossing was dangerous. It is undisputed that the crossing itself was on the railroad's right-of-way, which also extended approximately 50 feet from the center of the tracks. But the County's duty of care is not strictly limited by the property line. *See Bober v. New Mexico State Fair*, 808 P.2d 614 (N.M. 1991). In *Bober*, the plaintiff was a motorist who had been injured in a collision with a car that was exiting the property of the defendant state fair. The collision occurred outside the boundary of the fair. The New Mexico Supreme Court held that the landowner's duty to avoid creating or permitting an unsafe condition on its premises was not limited by the physical boundaries of the land. *Id.* at 618-619. Instead, the state fair could be found to have acted unreasonably under Ms. Bober's theory that it permitted "a concentrated stream of traffic [to exit] the premises at a single point without adequate traffic controls . . . ." 808 P.2d at 618.

Applying the holding of *Bober*, we hold that a jury could determine that the County's failure to take any action at all to make the crossing safer by attention to its roadway approaching the crossing breached the County's duty of reasonable care. As we have noted, under the doctrine of law of the case we are bound by the previous panel's determination that a jury could find the County's negligence to have been a proximate cause of the accident. Therefore, it was error for the district court to grant the County's motion for summary judgment.

The judgment of the district court is REVERSED, and the case is REMANDED for further proceedings consistent with this order and judgment.

ENTERED FOR THE COURT


William J. Holloway, Jr.
Circuit Judge

12-2057, *Henderson v. Board of County Commissioners*

**HARTZ**, Circuit Judge, dissenting:

I respectfully regret that I must categorically dissent. I find the majority opinion baffling because it gives no guidance to local governments about what they can do to avoid liability arising from accidents at rural railroad crossings.

The majority opinion states that the County's liability can be based on the absence of adequate signage or failure to clear vegetation from County property. But it does not explain what signage should have been required (or why) or why clearing vegetation would have made any difference. It also endorses improper speculation that there was vegetation on County property that obscured the view of the tracks.

First consider signage. There was a stop sign before the railroad tracks. That sign clearly informed drivers that they were to come to a full stop and look for crossing traffic before proceeding. The driver at the stop sign would have no doubt that a railroad crossing was just ahead. Not only would the railroad tracks be obvious, but a sign warned of a railroad crossing. Although the majority opinion suggests that the crossing sign was smaller than the standard sign, no one could reasonably conclude that the smaller size created any problem. It could not be ignored by anyone coming to a halt for the stop sign.

So what more could additional signage do? The majority opinion does not tell us. One possibility would be a sign giving advance warning of the stop sign. That would be appropriate if it were reasonable to believe that a driver on

Wildflower Lane would not see the stop sign in time to come to a full stop. But no evidence in this case suggests that such a belief would be reasonable. The road, as Plaintiffs insist, was in bad condition and travel would be relatively slow. At any reasonable speed on the road, the stop sign would be clearly visible in plenty of time to stop.

I can think of no other possibilities, nor has any other possibility been suggested by Plaintiffs or the majority opinion. Are they thinking of a sign that would say "Please Stop at the Stop Sign" or "Failure to Stop at the Stop Sign Can Be Dangerous"? And if the County added such a sign, would that be enough? There is no limiting principle recognized in the majority opinion. As best as I can understand its reasoning, if there is an accident at a dangerous railroad crossing (and all railroad crossings are dangerous), a jury can decide that reasonable care required additional signage.

What about the failure to clear vegetation? To begin with, there is NO evidence in the record that any vegetation on County property obscured the view of the railroad tracks from Wildflower Lane. This point was made in the County's appellate brief and not disputed in Plaintiffs' reply brief. Undeterred, the majority opinion offers the following:

> The record evidence is not specific as to the location of foliage obstructing a motorist's view of approaching trains. We have noted, however, that there is evidence from which a jury could decide that foliage outside the railroad's right-of-way creates or contributes to the problem. The state of this evidence is not fatal at the summary

judgment stage for two reasons. First, it is a reasonable inference from Plaintiffs' evidence that at least some of the visual obstruction is created by foliage within the County's right-of-way. The County admittedly had done nothing to improve visibility along Wildflower Lane. It would be quite illogical – and quite contrary to our standard of review of summary judgment decisions – to assume that the growth stopped on its own upon reaching the County's right-of-way. Second, and more importantly, even if at trial it were shown that none of the vision-obscuring vegetation was within the County's right-of-way, a jury could still determine that the County's road was unreasonably dangerous for failure to provide adequate warning of this hazard lying just across the line delineating the limit of the County's ownership of the road.

Op. at 9–10.

The quoted passage contains a radical departure from long-honored summary-judgment standards. Without referring to any evidence regarding the location of the vegetation that obscured the view of the railroad tracks from the portion of Wildflower Lane under County control (the last 50 feet before the railroad tracks were within the railroad's right-of-way), and without referring to any evidence regarding the width of the County's right-of-way, the majority opinion states that under our summary-judgment standard of review one can reasonably infer that some of the obscuring vegetation was in that right-of-way. I beg to differ. Permitting such an inference is totally contrary to summary-judgment jurisprudence that forbids such wild speculation. We certainly should not permit such speculation when it would have been so easy to produce evidence of trees or the like within the County's right-of-way if indeed there were any. In fact, the only relevant evidence in the record strongly implies the truth of what

-3-

the majority opinion would find to be "quite illogical."  The photographs taken from Wildflower Lane outside the railroad's right-of-way indicate that the vegetation on the side of the road consists of grass and small shrubs until reaching a line of trees a good distance away, as might be expected in that area if the County's right-of-way had been cleared at some time in the past, because trees do not just sprout up as they might in other parts of the country.  Moreover, the diagram attached to the Brian Charles affidavit quoted by the majority opinion shows (1) that the only trees that would block the view of the tracks on the right as one approached on Wildflower Lane were some 100 feet away from the road (presumably outside the County right-of-way) and (2) that a small clump of trees on the left (which would have only briefly blocked the view in that direction, which was not the direction from which the train was coming in the accident here) was about 20 feet off the road.

As for the failure to warn of the obscuring trees, I wonder what the majority opinion has in mind.  Should the County have erected a sign saying, "Warning.  There is a railroad track in the distance beyond the obscuring trees."?  This leads to a second reason why liability cannot be based on obscuring trees, even if they were on County property: for the 50 feet leading up to the railroad tracks, which includes the location of the stop sign, there was an unobstructed view down the tracks.  The majority opinion makes no attempt to explain why a driver needed to see approaching trains before entering the railroad's right-of-way

-4-

and stopping at the stop sign. There would certainly be a need if there were no stop sign, because the sight of an approaching train would inform the driver of the danger of crossing the tracks without stopping. Here, however, the driver needed to stop regardless, because the stop sign so ordered. And, although the majority opinion may be assuming otherwise, it is undisputed that there was a clear view down the tracks from the stop sign—indeed, from everywhere within the railroad's right-of-way. The Brian Charles report states:

> The view of the northbound train approach inside the right of way fence and from the area of the stop sign to the south is completely unobstructed for well over 1,000 feet down the tracks (there are photographs provided that depict the visibility). In other words if Mr. Stoller pulled up to the area of the stop sign and stops, there isn't any vegetation to interfere with his view of an approaching train.

Aplt. App. at 311. True, the record contains testimony that it could be difficult to see approaching trains even from the stop sign. But that was not because of vegetation obscuring the view. The difficulty arose because the train blended in with the background. That background would necessarily create the same problem viewing the train anywhere along Wildflower Lane. In the circumstances, it would not be reasonable to require the County to cut down trees within its right-of-way.

My differences with the majority opinion go beyond any disagreement about whether a particular action should be required to satisfy the standard of care. My principal concern is the failure of the majority opinion to describe the

particular action that should have been required and explain why that action would have enhanced safety. Such specificity and explanation is essential to give guidance to local governments regarding what can be expected of them.[1] In their absence, local governments are facing what amounts to a res ipsa loquitur standard—they will be presumed negligent whenever there is an accident at a railroad crossing. Because they cannot know what will suffice to protect them from litigation, the most reasonable course of action for low-income rural counties may well be to abandon all minor roads that cross railroad tracks. Indeed, their insurers may demand that action if coverage is to be continued. That would be an unfortunate consequence of a failure of judicial guidance.

---

[1] For example, in *Bober v. New Mexico State Fair*, 808 P.2d 614 (N.M. 1991), the claim was that the State Fair was negligent in not guarding against exiting traffic trying to turn left onto Louisiana Boulevard by placing traffic cones, installing a "no left turn" sign, or having an officer direct traffic. *See id.* at 648. We should demand no less specificity from Plaintiffs here.